890 P.2d 1197

**CONVENTION CENTER AUTHORITY, State of Hawai'i, Plaintiff,**

**v.**

**Earl I. ANZAI,[1] in his capacity as Acting Director of Finance, Department of Budget and Finance, State of Hawai'i; County of Hawai'i; County of Maui; County of Kaua'i; and City and County of Honolulu, Defendants.**

**No. 17837.**

Supreme Court of Hawai'i.

March 14, 1995.

1. The present action was initially instituted on March 7, 1994 against Eugene Imai, then-State Director of Budget and Finance. After the November 1994 general election, and while this case was pending before us, newly elected Governor Benjamin Cayetano appointed Earl I. Anzai to succeed Eugene Imai as State Director of Budget and Finance, subject to the advice and consent of the Senate. *See* Haw. Const. art. V, § 6, ¶ 2. Pursuant to Hawai'i Rules of Appellate Procedure (HRAP) Rule 43(c)(1), Anzai has been substituted automatically for Imai as a defendant in the present case.

John W. Anderson and Charleen M. Aina, Deputy Attys. Gen., Honolulu, Samuel I. Hellman, Kam T. Wong and W. Cullen MacDonald, pro hac vice, of Hawkins, Delafield & Wood, New York City, on the briefs, for plaintiff.

Andrew V. Beaman of Chun Kerr Dodd & Kaneshige, Honolulu, Roger L. Davis and George A. Yuhas, pro hac vice, of Orrick, Herrington & Sutcliffe, San Francisco, CA, on the briefs, for defendant Earl I. Anzai, in his capacity as Acting Director of Finance.

Richard D. Wurdeman, Corp. Counsel, County of Hawai‘i, on the briefs, Hilo, for defendant County of Hawai‘i.

Jeffrey P. Schmidt, Deputy Corp. Counsel, County of Maui, on the briefs, Wailuku, Maui, for defendant County of Maui.

Galen T. Nakamura, Deputy County Atty., County of Kaua‘i, on the briefs, Lihue, Kaua‘i, for defendant County of Kaua‘i.

Before MOON, C.J., and KLEIN, LEVINSON, NAKAYAMA and RAMIL, JJ.

MOON, Chief Justice.

In an original proceeding brought by the parties to this court upon an agreed statement of facts, pursuant to section 27 of Act 7,[2] 1993 Hawai‘i Session Laws (Spec.Sess.) [hereinafter Act 7], and HRAP Rule 14,[3] the plaintiff Convention Center Authority, State of Hawai‘i (the Authority) seeks to obtain a determination as to whether the bonds authorized by the 1993 Legislature to build and operate a convention center would be exempt from the constitutional debt limit.

We hold that the one percent increase in the transient accommodations tax (TAT), earmarked in part for financing the development and construction of a state convention center by the 1993 Hawai‘i State Legislature, qualifies as a "user tax," and that the revenue bonds, authorized by the legislature for the development and construction of the proposed convention center, qualify for exclusion from the debt limit as mandated by the Hawai‘i Constitution. However, based on the plain language of the Hawai‘i Constitution's reimbursable general obligation bond exclusion and its corresponding constitutional history, the reimbursable general obligation bonds, authorized by the legislature for the development and construction of the proposed convention center, do not qualify for exclusion from the constitutional debt limit.

## I. BACKGROUND

### A. The Parties

The Authority was established by the legislature in 1988, after much discussion regarding the development and construction of a convention center in Hawai‘i. The Authority is a corporate body consisting of seven members who are appointed by the governor

2. Section 27 of Act 7 provides:
   The state supreme court shall have exclusive and original jurisdiction over any controversy or dispute regarding the financing of the convention center through the issuance of revenue bonds, general obligation bonds, and reimbursable general obligation bonds, and the security provisions therefor, and the imposition and collection of the transient accommodations tax to repay or provide security for the bonds; provided that such jurisdiction be limited to the applicability of Article VII of the Constitution of the State of Hawai‘i to such matters.

3. HRAP 14(a), relating to the submission of agreed-upon facts, provides:

   Parties to a dispute which might be the subject of a civil action or proceeding addressed to the jurisdiction of the Hawai‘i appellate court, circuit court, district court, family court, land court, or tax appeal court may, without action, agree upon containing the facts upon which the controversy depends, a statement of the question or questions in difference, the contentions of the parties, and the form of judgment to be rendered.

"on the basis of their knowledge, interest, and proven expertise in, but not limited to, one or more of the following fields: finance, law, architecture, commerce and trade, corporate management, marketing, economics and visitor industry." Hawai'i Revised Statutes (HRS) § 206X–3(b) (Supp.1992). The Authority's purpose is "to review for approval the proposed convention center development plan of a developer and to supervise the development by a developer of all development within the convention center district pursuant to the convention center development plan approved by the authority...." HRS § 206X–4(a) (Supp.1992).

The defendant Earl I. Anzai[4] is the acting State Director of Budget and Finance (the Director), whose responsibilities include administering the state debt and insuring the state's compliance with the debt limitations mandated by article VII, section 13 of the Hawai'i Constitution. The Director is responsible for preparing detailed statements showing, among other things, the total indebtedness of the state, and the amount of all categories of indebtedness properly excludable from the calculation of the debt limit. After giving the Attorney General and the Comptroller the opportunity to review the statements and object to any item contained therein, the Director is to certify these statements to the Governor and the presiding officers of the legislature. The significance of this certification by the Director is that it determines the amount of general obligation bond debt that the state may lawfully incur and it therefore limits the amount of such bonds that the state can issue and sell. If it has not been determined whether certain bonds or categories of bonds are properly excludable under the exceptions to the debt limit set out in article VII, section 13(1)–(9), then those bonds must be included in the Director's debt limit calculations until the excludability issue is judicially resolved. *See* HRS § 39–93(e) (1985).[5]

The defendant counties of Hawai'i, Maui, and Kaua'i, and the City and County of Honolulu (the defendant counties) are the political subdivisions of the state. They are involved in the present case because, pursuant to HRS § 237D–6.5 (Supp.1992), each receives a portion of the revenues generated by the TAT, a portion of which is implicated in this case.

### B. *The TAT, the Tourist Industry, and the Proposed Convention Center*

The TAT was adopted by the legislature in 1986 and is a tax imposed on operators of transient accommodations, which include hotels, apartments, condominiums, and the like, that are customarily occupied for less than 180 days. HRS § 237D–2 (Supp.1992). Prior to its adoption, the proponents of the TAT had proposed that the proceeds of the TAT be dedicated to the funding of activities designed to enhance the tourist industry, including a convention center:

> Mr. President, 20 years ago you and I were elected to office. You and I had the honor of serving on the House Finance Committee with our erstwhile [sic] Ways and Means chairman, and you and I heard the plea by the Hawaii Visitors Bureau [ (HVB) ] at that time for more funding to generate assistance in finance to promote Hawaii more effectively, and for the last 18 years, from that time, I have strongly opposed the imposition of a room tax on our hotel industry. However, this year for the first time, I agreed to support a bill calling for a hotel room tax on the condition that the revenues from this tax would be earmarked, and I repeat, earmarked, for permanent funding for the HVB and for the design and construction of a convention center in Hawaii.
>
> Mr. President, I supported the earmarking for two reasons. First, the Hawaii

---

**4.** *See supra* note 1.

**5.** HRS § 39–93(e) provides in pertinent part:
   In the event the certification by the director of finance shall set forth therein that the attorney general or the comptroller has disagreed to any item therein, until such time as the disagreement is resolved by a declaratory judgment action ... (2) if the subject matter of the disagreement is concerned with whether bonds may be excluded under section 13 of Article VII of the Constitution in determining the total outstanding indebtedness of the State, the bonds shall be included in making such determination.

Visitors Bureau would receive permanent funding in order to increase its promotional efforts of the Islands. This is critical, especially now when troubled world conditions are keeping tourists away from popular vacation spots in Europe and drawing them to Hawaii. Second, I sincerely believe, Mr. President, we need a convention center. It would be a magnificent asset for this state, enhancing our tourism market, furnishing the state with increased revenues, and providing for a greater diversification of our economic base are all potential benefits which would result from sufficiently funding the HVB and developing a convention center complex.

Mr. President, after months of debate and discussion, proponents of financing the convention center through a room tax reached agreement with members of the tourism and hotel industry because the stance that was taken that the revenues generated from this tax would be earmarked for the HVB, a convention center, and to the counties for tourism related activities.

Earmarking and a room tax went hand in hand. Remember, the Senate's original position for this legislation was a package of three Senate bills which proposed the selection of a site for the center, the creation of an authority, and the method of financing and earmarking the room tax. As this session ran its course, each bill diverged farther and farther away from its original intent to the final form before us today. This bill is what remains of the convention center package and this bill, in my view, has very little to do with tourism or a convention center.

Testimony of Senator W. Buddy Soares on Conf.Comm.Rep. No. 66–86 (H.B. No. 2805–86, H.D. 1, S.D. 1, C.D. 1), in 1986 Senate Journal, at 652. Despite the criticism, as voiced by Senator Soares, no portion of the TAT was earmarked for either the tourist industry, the HVB, or the convention center. The proceeds from the five percent tax went directly into the state's general fund.

In 1988, the state legislature first enacted legislation to specifically address the need for a convention center and, as noted above, passed legislation establishing the Authority. In doing so, the legislature made the following findings:

Tourism has been and probably will remain the mainstay of Hawai'i's economy. Although prospects for the tourism industry appear to be excellent for the foreseeable future, the legislature finds that certain steps should be taken to ensure this continued vitality. The legislature finds and declares that the construction of a world-class convention center facility would strengthen Hawai'i's economy by expanding its market size to convention-going visitors.

Conventioneers, because they spend more money per day than other visitors, are exceedingly desirable guests. An added benefit is that most conventions are normally held during the traditional tourist off-season. This influx of convention dollars during the normal tourist off-season results in greater year-round economic stability for all Hawai'i.

HRS § 206X–1 (Supp.1992). The 1988 act further provided that the convention center facility should be centrally located within Waikiki to best address the needs of prospective conventioneers and suggested possible sites. However, the 1988 act did not provide any specific mechanism for financing the convention center.

In 1993, the legislature revisited the convention center issue and made the following findings:

The legislature finds that convention organizers from around the country have bypassed Hawai'i for other destinations because the State lacks the facilities to house these participants, sessions and workshops, and displays in a professional manner. The loss of convention-related business to other destinations could have long-lasting and far-reaching impacts on the State, not only on Oahu but on the neighbor islands as well, since Hawai'i's economy is heavily dependent on the tourist trade generated by these conventions.

Act 7, Part II, § 11. As part of comprehensive amendments to the 1988 act, the 1993 legislature authorized the issuance of up to $350,000,000 in general obligation bonds or

reimbursable general obligation bonds, and $350,000,000 in revenue bonds to finance the development and construction of a convention center. Act 7, Part II, §§ 23,[6] 24.[7] Act 7 also established the Convention Center Capital and Operations Special Fund, into which all the revenues derived from the proposed convention center would be deposited. The legislature further increased the TAT by one percent, from five percent to six percent, and specifically earmarked the one percent increase for deposit into the Convention Center Capital and Operations Special Fund, to be dedicated to the payment of expenses associated with the development, construction, and operation of the convention center.

The 1993 legislation did not limit the types of bonds that could be used to finance the convention center. The legislature provided that these bonds could consist of general obligation bonds, reimbursable general obligation bonds, or revenue bonds. Act 7, Part II, §§ 23, 24. Reimbursable general obligation bonds and revenue bonds are excludable from the debt limit, while general obligation bonds are not. Haw. Const. art VII, § 13(2), (6).

## C. *The Present Action*

After the 1993 legislation had been enacted, the Authority sought to have the Director issue the bonds authorized by the legislature. The Director refused, asserting that it was unclear whether the bonds authorized by the legislature were exempt from the calculation of the state debt subject to the constitutional debt limitation. By original complaint filed March 7, 1994, the Authority instituted the present action against the Director and the defendant counties to obtain a determination as to whether the bonds authorized by the 1993 legislature to build and operate a convention center would be exempt from the constitutional debt limit.

On April 13, 1994, this court entered an order directing the Authority to show cause as to why the defendant counties should not be dismissed from this proceeding, and, on April 25, 1994, the Authority filed its response. On May 16, 1994, the Authority filed a Statement of All Parties' Inability to File an Agreed Statement of Facts insofar as the County of Kaua'i declined to execute the proposed statement of facts circulated by the Authority, citing the lack of a good faith controversy involving the County of Kaua'i. The Authority subsequently filed a Statement of Facts on June 15, 1994, to which the remaining parties filed responses.

On July 8, 1994, the Authority filed a Motion for Order Certifying the Evidentiary Record to be Complete and Allowing Additional Time to File the Opening Brief, which we granted by order filed July 13, 1994. The order further provided that the County defendants were permitted to address the issue whether the complaint against the counties should be dismissed in their answering

---

**6.** Section 23 of Act 7 provides:
The director of finance is authorized to issue general obligation bonds or reimbursable general obligation bonds, or any combination thereof in the aggregate principal amount of $350,000,000 or so much thereof as may be necessary, and the same amount, or so much thereof as may be necessary, is appropriated for fiscal years 1993–1994, and 1994–1995, to be expended by the authority for the purposes of this Act, including, without limitation, the financing and refinancing of all or any part of the cost of planning, designing, improving, acquiring, constructing, equipping, or furnishing the convention center facility authorized in this Act; the financing of any public facilities related thereto that are capable of being financed with the proceeds of the bonds, and the payment of interest on such bonds that will accrue during the construction period and for six months thereafter.

**7.** Section 24 of Act 7 provides:

The authority, with the approval of the director of finance and the governor, is authorized to issue revenue bonds in an aggregate principal amount of $350,000,000, or so much thereof as may be necessary, and the same amount, or so much thereof as may be necessary, is appropriated for fiscal years 1993–1994, and 1994–1995, from moneys in the convention center capital and operations special fund, to be expended by the authority for the purposes of this Act, including, without limitation, the financing and refinancing of all or any part of the cost of planning, designing, improving, acquiring, constructing, equipping, or furnishing the convention center facility authorized in this Act; the financing of any public facilities related thereto that are capable of being financed with the proceeds of the bonds, and the payment of interest on such bonds that will accrue during the construction period and for six months thereafter.

briefs. By letter dated and filed November 29, 1994, the City and County of Honolulu informed this court that it had no position in this matter and would not be filing briefs.

## II. *STANDARD OF REVIEW*

This court accepted original jurisdiction of this matter, and, therefore, there is no standard of review as such. *Blair v. Cayetano,* 73 Haw. 536, 541, 836 P.2d 1066, 1069, *reconsideration denied,* 74 Haw. 650, 843 P.2d 144 (1992). However, "we have long held that: (1) legislative enactments are 'presumptively constitutional;' (2) 'a party challenging [a statutory scheme] has the burden of showing unconstitutionality beyond a reasonable doubt;' and (3) the constitutional defect must be 'clear, manifest[,] and unmistakable.' " *Pray v. Judicial Selection Comm'n,* 75 Haw. 333, 340, 861 P.2d 723, 727 (1993) (quoting *Sifagaloa v. Board of Trustees of the Employees' Retirement Sys.,* 74 Haw. 181, 191, 840 P.2d 367, 371 (1992) (quoting *Blair,* 73 Haw. at 542, 836 P.2d at 1069) (brackets in original and citations omitted)).

■ Because the Director's refusal to issue the bonds for fear of exceeding the constitutional debt limit in essence, challenges the constitutionality of the legislature's authorization of the issuance of the bonds, the Director has the burden of demonstrating that sections 23 and 24 of Act 7 are plain, clear, manifest, and unmistakable violations of article VII, sections 12 and 13 of the Hawai'i Constitution.

## III. *DISCUSSION*

### A. *Jurisdiction and Justiciability*

The legislature has specifically provided that this court has original jurisdiction over controversies or disputes relating to the convention center pursuant to section 27 of Act 7.[8] The counties of Hawai'i and Maui argue that, even if the above-quoted passage does confer jurisdiction on this court for the matters set forth in the passage, the present matter is not justiciable primarily because it is not ripe for adjudication. The County of Hawai'i asserts that the Authority "seeks a

ruling on the effect of [the authorized] bonds upon the State debt limit, without any evidence that the anticipated issue will affect that limit. Clearly it seeks to solve a problem that may not exist." County of Hawai'i's Answering Brief at 4.

The County of Maui emphasizes that Act 7, section 27 states that this court "shall have exclusive and original jurisdiction *over any controversy or dispute,*" and the existence of a dispute or a controversy is an essential requirement to establish this court's jurisdiction. Maui County is essentially arguing that, because it deserves to be dismissed on the ground that the Authority's complaint fails to state a cause of action, this court does not have jurisdiction. This argument is perplexingly circular because this court would need jurisdiction to determine whether the Authority states a cause of action in order to determine whether the court has jurisdiction. The argument, however, is essentially the same argument as ripeness, only tied to the language of the statute.

■ This court has noted that "[r]ipeness is peculiarly a question of timing," and "[a] ruling that an issue is not ripe ordinarily indicates the court has concluded a later decision [may be] more apt ... or that the matter is not yet appropriate for adjudication." *State v. Fields,* 67 Haw. 268, 274–75, 686 P.2d 1379, 1385 (1984) (citations omitted). On the facts presented in the record, it appears that the matter became ripe upon the Director's refusal to issue the bonds. Whether the Director had a basis in fact upon which to refuse to issue the bonds is irrelevant to a determination whether a controversy or dispute exists; the Director's refusal alone is sufficient to generate a "dispute" or "controversy." The Director's issuance of the bonds is the sole means of acquiring the financing under the scheme set out by the legislature, and the Director's refusal to issue the bonds has conclusively foreclosed any opportunity to finance the convention center. Consequently, this case presents a genuine controversy and is ripe for adjudication.

---

8. *See supra* note 2.

### B. *The Merits*

#### 1. Framework of Article VII of the Hawai'i Constitution.

Article VII, section 13 of the Hawai'i Constitution defines the debt limit of the State:

A sum equal to fifteen percent of the total of the assessed values for tax rate purposes of real property in each political subdivision, as determined by the last tax assessment rolls pursuant to law, is established as the limit of the funded debt of such political subdivision that is outstanding and unpaid at any time.

*Id.* Section 13 also sets out specific exceptions to the debt limit:

In determining the power of the State to issue general obligation bonds or the funded debt of any political subdivision under section 12, *the following shall be excluded:*

. . . .

2. *Revenue bonds,*[9] if the issuer thereof is obligated by law to impose rates, rentals and charges for the use and services of the public undertaking, improvement or system [10] or the benefits of a loan program or a loan thereunder or to impose a user tax, or to impose a combination of rates, rentals and charges and user tax, as the case may be, sufficient to pay the cost of operation, maintenance and repair, if any, of the public undertaking, improvement or system or the cost of maintaining a loan program or a loan thereunder and the required payments of the principal of and interest on all revenue bonds issued for the public undertaking, improvement or system or loan program, and if the issuer is obligated to deposit such revenues or tax or a combination of both into a special fund and to apply the same to such

payments in the amount necessary therefor.

. . . .

6. *Reimbursable general obligation bonds* [11] issued for a public undertaking, improvement or system but only to the extent that reimbursements to the general fund are in fact made from the net revenue, or net user tax receipts, or combination of both, as determined for the immediately preceding fiscal year.

*Id.* (emphasis added). "General obligation bonds" are "all bonds for the payment of the principal and interest of which the full faith and credit of the State or a political subdivision are pledged and, unless otherwise indicated, includes reimbursable general obligation bonds." Haw. Const. art. VII, § 12(2).

Of the three types of bonds authorized by the legislature for issuance to finance the convention center, general obligation bonds are not exempt from the calculation of the debt limit. *See* Haw. Const. art. VII, § 13 ("Effective July 1, 1980, the legislature shall include a declaration of findings in every general law authorizing the issuance of general obligation bonds that the total amount of principal and interest, estimated for such bonds and for all bonds authorized and unissued and calculated for all bonds issued and outstanding, will not cause the debt limit to be exceeded at the time of issuance."). Revenue and reimbursable general obligation bonds may be exempt under certain circumstances, but, as a threshold matter, they must first be secured by either revenue from the public undertaking or by a user tax. Haw. Const., art. VII, § 13(2), (6). A "user tax" is defined as:

a tax on goods or services or on the consumption thereof, the receipts of which are

---

9. Article VII, section 12(7) of the Hawai'i Constitution defines "revenue bonds" as "all bonds payable from the revenues, or user taxes, or any combination of both, of a public undertaking, improvement, system or loan program and any loan made thereunder and secured as may be provided by law."

10. There is no dispute that the convention center qualifies as a "public undertaking, improvement or system."

11. Article VII, section 12(6) of the Hawai'i Constitution defines "reimbursable general obligation bonds" in pertinent part as "general obligation bonds issued for a public undertaking, improvement or system from which revenues, or user taxes, or a combination of both, may be derived for the payment of the principal and interest as reimbursement to the general fund and for which reimbursement is required by law. . . ."

*substantially derived* from the consumption, use or sale of goods and services in the utilization of the functions or services furnished by a public undertaking, improvement or system.

Haw. Const. art. VII, § 12(9) (emphasis added).

The Convention Center Capital and Operations Special Fund, which would directly secure the bonds in the case of revenue bonds or reimburse the general fund in the case of reimbursable general obligation bonds, has two sources: (1) the revenue from the convention center,[12] once completed; and (2) the one percent increase in the TAT earmarked by the legislature for the convention center. The outcome-dispositive issue, therefore, is whether the one percent increase in the TAT earmarked for the development and construction of the convention center qualifies as a "user tax," or more specifically, whether such tax is "substantially derived" from the convention center as those terms are used in the definition of "user tax" in article VII, section 12(9) of the Hawai'i Constitution.

### 2. Legislative Findings Support the Authority's Position, But Are Not Dispositive of the Ultimate Issue In the Case.

As noted above, in order to qualify as a "user tax" under article VII, section 12(9) of the Hawai'i Constitution, the tax in question must be "substantially derived" from the "consumption, use or sale of goods and services in the utilization of the functions or services furnished by a public undertaking, improvement or system." When authorizing the issuance of the bonds in question and earmarking the one percent increase in the TAT for the convention center, the 1993 legislature made the following findings:

> The revenue bonds issued by the authority to finance the convention center are to be repaid entirely from the convention center capital and operations special fund. This special fund is funded by revenues from the transient accommodations tax and operations of the convention center. *The [TAT] is substantially derived from a*

*function of the convention center to increase and maintain sales of hotel rooms and other transient accommodations.*

Act 7, § 11 (emphasis added).

The Authority asserts that the last finding that the TAT as a whole, and necessarily the earmarked one percent thereof, is "substantially derived" from a "function of the convention center" that increases and maintains sales of hotel rooms, was based upon substantial testimony and other legislative evidence and is entitled to deference by this court. The Director agrees that the findings are entitled to substantial deference by this court, but asserts that the findings are not dispositive of whether the revenues meet the "substantially derived" test under article VII, section 12(9) of the Hawai'i Constitution.

We agree that the legislature's findings are entitled to substantial deference; however, "[a]merican legislatures must adhere to the provisions of a written constitution.... Our ultimate authority is the Constitution; and the courts, not the legislature, are the ultimate interpreters of the Constitution. It is the concept of the Constitution as law, and the judiciary as the institution with responsibility to interpret the law, which remains the cornerstone of judicial review today." *State v. Nakata,* 76 Hawai'i 360, 370, 878 P.2d 699, 709 (1994) (internal citations and brackets omitted). We therefore turn to an analysis of the nature of the relationship between a purported "user tax" and a public project, as required by the term "substantially derived" set out in article VII, section 12(9) of the Hawai'i Constitution.

### 3. The Nature of the Relationship Between TAT Revenue and the Proposed Convention Center As Required by the Term "Substantially Derived" in Article VII, Section 12(9) of the Hawai'i Constitution.

The Authority asserts that the "substantially derived" standard under article VII, section 12(9) is "quintessentially pragmatic," and contends that the modifier "substantial-

---

12. There is no dispute that revenue from the convention center is a proper means of financing the bonds, or that revenue bonds secured by such

revenue would be exempt from the constitutional debt limit.

ly" indicates that the requisite nexus between the portion of the tax in question and the public project need not be precise or exact. The Director acknowledges that the constitutional language demonstrates that the requisite nexus need not be precise and concedes that a logical nexus between the TAT revenue and the proposed convention center exists. The Director further maintains, and we agree, that the nature of this nexus is composed of at least two parts: (1) a "temporal" element, which raises the primary issue whether the convention center must be in existence before the earmarked portion of the TAT can qualify as a "user tax"; and (2) a "causal" element, which raises the issue of the logical relationship between TAT revenue and the convention center. We first address the temporal element.

### a. "Temporal" Element.

### i. The "Natural Sense" of the Language of Article VII, Section 12(9) of the Hawai'i Constitution Is Unclear as to Whether the Public Undertaking Being Financed Must Exist Prior to the Taxes Involved in the Proposed Financing Scheme Qualifying as a "User Tax."

This court has noted that "the words of the constitution are presumed to be used in their *natural sense* ... 'unless the context furnishes some ground to control, qualify or enlarge [them].'" *State ex rel. Amemiya v. Anderson*, 56 Haw. 566, 577, 545 P.2d 1175, 1182 (1976) (brackets in original) (emphasis added) (quoting *Employees' Retirement Sys. v. Ho*, 44 Haw. 154, 159, 352 P.2d 861, 864–65 (1960)). However, the "natural sense" of the language of section 12(9) is unclear as to whether the proposed public undertaking, improvement or system must exist before the tax involved in the financing scheme for the project can qualify as a "user tax."

As we have indicated, section 12(9) provides that the receipts from a "user tax" must be "substantially *derived* from the consumption, *use* or sale of goods and services in the *utilization* of the functions or services furnished by a public undertaking, improvement or system" (emphasis added). Although the definition requires that the purported user tax must be "derived" from the "use" or "utilization" of the public undertaking, it is not explicit as to *when* such "use" or "utilization" must occur. The terms of the definition do, however, implicitly suggest that the "derivation" must have *some* pre-existing source. "Derive" is defined as "to receive or obtain from a *source or origin* ... to trace from a *source or origin....*" *The Random House College Dictionary* 358 (Rev. ed. 1979) (emphasis added). "Use" is defined in relevant part as "to employ for some purpose; put into service; ... to expend or consume in use." *Id.* at 1448. "Utilize" is defined as "to put to use; turn to profitable account." *Id.* at 1449. Thus, the definitions of all three terms appear to assume the prior existence of the project being "used" or "utilized." However, this impression is not dispositive of the issue precisely because we cannot conclude that the "natural sense" of section 12(9), taken as a whole, requires that the public project exist prior to the tax involved in the project's financing qualifying as a "user tax."

Moreover, even if we were left with a firm conviction to the contrary, we are nevertheless bound to examine the context in which the material terms of section 12(9) are employed in order to determine if there is any basis to "control, qualify or enlarge" them. *Anderson*, 56 Haw. at 577, 545 P.2d at 1182. We therefore look to the context of the usage of the term "user tax" and the history and evolution of the bond exclusion provisions of the Hawai'i Constitution for guidance.

### ii. The Evolution of the Revenue Bond Exclusion Indicates That A Public Undertaking, Improvement, or System Need Not Exist Before a Tax That Finances the Project Can Qualify as a "User Tax."

Hawai'i's Constitution has had some form of debt limitation in place essentially from its inception. Under the Organic Act, the debt limit was set at ten percent of the assessed value of real property. The limit was subsequently increased to fifteen percent at the 1950 Constitutional Convention. *Hawaii Constitutional Convention Studies, Article*

*VI: Taxation and Finance,* Legislative Reference Bureau, at 37–38 (July 1968).

Even in Hawai'i's original 1959 constitution, not all debt was included in applying the debt limitations. Specifically, certain revenue bonds and improvement district bonds were exempted. However, the exemption for revenue bonds in the 1959 Constitution was very narrow. In order for the underlying debt to be exempt from the constitutional debt limit, the revenue from the public undertaking was required to be the "only security for such indebtedness." *Employees' Retirement Sys. v. Ho,* 44 Haw. 154, 168, 352 P.2d 861, 872 (1960) (citing Haw. Const. art. VI, § 3, ¶ 7 (1959)).

In *Ho,* this court had occasion to consider the excludability of certain highway and airport bonds in light of the revenue bond exclusion of the 1959 Constitution. The territorial legislature had authorized the issuance of $49,225,000 in highway revenue bonds and $14,000,000 in aviation revenue bonds to finance the acquisition of land for, and the design and construction of, new highways and an airport on O'ahu. The highway revenue bonds were secured by a special fund financed solely by the proceeds from highway vehicle fuel taxes. The aviation revenue bonds were also secured by a special fund financed by the proceeds from aviation fuel taxes and the revenues of the Hawai'i Aeronautics Commission. Both the highway vehicle fuel taxes and the aviation fuel taxes were in existence and were generating revenue before their respective projects were initiated. Holding that both types of bonds were not excludable from the constitutional debt limit, this court noted that inasmuch as the revenue bond exclusion of then-article VI, section 3, paragraph 7 explicitly provided that in order to qualify for exclusion, a revenue bond must be secured only by the revenues from the public project being financed by the revenue bonds. Further, because both the highway and airport revenue bonds financed projects that did not yet exist and were secured by highway and aviation fuel taxes, respectively, they were not secured solely by revenues of their respective projects and were therefore not excludable from the debt limit.

Specifically in response to the *Ho* decision, the delegates to the 1968 Constitution Convention amended the revenue bond exclusion to allow revenue bonds to be excludable from the debt limit even if they were secured by "user taxes," and not solely by the revenues of the projects. In its Standing Committee Report No. 52, the Committee on Taxation and Finance [hereinafter, the Committee] stated:

> Your Committee recommends a major redrafting of Section 3 of Article VI. The committee recommendations are designed to achieve the following objectives:
>
> . . . .
>
> 9. To remedy technical flaws in the revenue bond provision.
>
> . . . .
>
> . . . Revenue bonds shall not count against debt limits. They must be authorized in the same fashion as general obligation bonds. Revenue bonds are redefined to be issuable by the State and counties as well as by public corporations and can be securable by user taxes as well as user revenues or special assessments.

> We still want to provide for the issuance of revenue bonds since under some circumstances they may be desirable. However, our present Constitution limits revenue bonds to public corporations and specifies that they must be secured solely by the revenues of the undertaking. This was the basis of the Supreme Court Ho case in 1960 which declared certain revenue bonds countable against the state debt limit because they were not issued by a public corporation and because some user tax revenues were pledged as security. We propose that the State and the counties (as well as public corporations) may issue revenue bonds and that user taxes as well as user revenues or special assessments can serve as security.

1 Proceedings of the Constitutional Convention of Hawaii of 1968, at 220–21 (1973).

The above-quoted passage makes it clear that the delegates to the 1968 Constitutional Convention, where the relevant amendments to the revenue bond exclusion were framed,

expressly intended to abrogate this court's holding in *Ho*. The amendments are instructive to the present case in two ways. First, as evinced by the delegates' use of the term "user taxes" in the amendments to the language of the revenue bond exclusion, and the constitutional history's indication that the delegates expressly intended to address *Ho,* the delegates considered the taxes at issue in *Ho* to be "user taxes."

· Second, from the language of the statutes authorizing bond issuance, it is clear that the highway and aviation revenue bonds addressed in *Ho* financed projects which were not yet in existence:

> **Deposit and use of proceeds.** (a) The proceeds from the sale of highway revenue bonds shall be deposited with the treasurer of the Territory in the territorial highway fund. Moneys from such funds shall be paid out by the treasurer upon the order of the superintendent of public works, who may expend them for the following purposes: ... (2) for the *design, construction,* reconstruction, repair and maintenance of, and *for engineering and acquisition of rights of way for,* highways in the Territory[.]

Rev.Laws Haw. (RLH) § 137–87 (1955) (emphasis added).

> **Deposit and use of proceeds.** The proceeds from the sale of aviation revenue bonds shall be deposited with the treasurer of the Territory in such funds as the resolution may direct, and shall be expended by the [Hawaiʻi aeronautics] commission for the following purposes: ... (b) for the *construction,* operation and maintenance of airports and air navigation facilities, *including acquisition of real property and interests therein[.]*

RLH § 137–101 (1958) (emphasis added). As is apparent from the language of the statutes, the proceeds from the bonds were intended to be used to fund the acquisition of real property and the design of the projects, all of which predate construction, as well as for the operation, repair, maintenance, and improvement of the projects, once constructed. Moreover, the taxes securing the bonds in *Ho* also predated the project. As the Director himself notes, the debates cited above indicate that fuel taxes pledged to repay debt associated with the construction of highways and an airport met the "substantially derived" standard because the tax revenues "bore a reasonable relationship to the facilities that were *to be built* or improved with the bond proceeds." (Emphasis added.)

■ In light of the foregoing, we conclude that it is not necessary for a public project to have been constructed in order for the taxes involved in the financing of the public project to qualify as "user taxes" as that term is defined in article VII, section 12(9) of the Hawaiʻi Constitution.

Moreover, we have long recognized that "[t]he Hawaiʻi Constitution must be construed with due regard to the intent of the framers and the people adopting it[,]" *State v. Kam,* 69 Haw. 483, 492, 748 P.2d 372, 377 (1988), and that "the fundamental principle in interpreting a constitutional provision is to give effect to that intent." *Id. Accord City & County of Honolulu v. Ariyoshi,* 67 Haw. 412, 419, 689 P.2d 757, 763, ("[t]he fundamental principle in construing a constitutional provision is to give effect to the intention of the framers and the people adopting it. In construing a constitutional provision, the court may look to the object sought to be established and the matters sought to be remedied along with the history of the times and state of being when the constitutional provision was adopted" (internal citations omitted)), *reconsideration denied,* 67 Haw. 682, 744 P.2d 779 (1984); *Huihui v. Shimoda,* 64 Haw. 527, 644 P.2d 968 (1982); *State v. Kahlbaun,* 64 Haw. 197, 638 P.2d 309 (1981); *State v. Miyasaki,* 62 Haw. 269, 614 P.2d 915 (1980).

Requiring the construction of a public project to be completed before the taxes involved in the project's financing could qualify as "user taxes," thereby eliminating any possibility of the bonds' excludability from the debt limit, would subvert the delegates' intent underlying the 1968 amendments to the revenue bond exception. Interpreting the language of section 12(9) so as to require such a direct and specific temporal nexus between the public project and the purported user tax would effectively nullify the amend-

ments and restore the holdings set forth in *Ho*.

### b. *"Causal" Element.*

We next turn to the nature of the "causal" element required by the language of section 12(9). As noted above, the Director concedes that there is a logical relationship between TAT revenues and the proposed convention center and further does not deny that the convention center will generate additional hotel and motel occupancy, thereby resulting in increased TAT revenues. The Director does contend, however, that a question remains as to whether the quantum of occupancy associated with the convention center bears a sufficient relationship to the earmarked portion of the TAT. The Director argues that the legislature earmarked approximately one-sixth of the TAT revenues for debt associated with the convention center and that it would be reasonable to conclude that the earmarked portion of the TAT is or will be substantially derived from the convention center *only if* this allocation bears a rational relationship to the quantum of occupancy that *realistically* could be expected from the convention center.

The Authority argues that a direct correlation between the percentage of the TAT earmarked for financing the convention center and the projected percentage increase in room sales attributable to the proposed convention center is not constitutionally required in this context. We agree for three principal reasons.

First, as the Director has noted, the presence of the modifier "substantially" in the term "substantially derived" demonstrates that the requisite nexus need not be precise. We believe that to interpret the language of section 12(9) as requiring "perfect congruence," as the Authority phrases it, between the percentage of the TAT earmarked for the convention center and the percentage increase in occupancy that could realistically be expected from the convention center, would run counter to the intent of the delegates, as clearly demonstrated by their use of the term "substantially" in the definition. The definition requires *some* causal relationship between the tax and the project, but that

relationship does not require the precision suggested by the Director.

Second, insofar as the legislature is better equipped than this court to examine the relationship between a proposed convention center and TAT revenues, we accord substantial deference to the legislature's findings regarding that relationship. *See Smith v. Cutter Biological, Inc.,* 72 Haw. 416, 455, 823 P.2d 717, 736 (Moon, J., concurring and dissenting) (noting that deference to the legislature is appropriate when it has spoken to an issue before this court because of legislature's "investigative powers and procedures"), *reconsideration denied,* 72 Haw. 616, 827 P.2d 1148 (1991); *cf. Hawaii Housing Authority v. Lyman,* 68 Haw. 55, 70, 704 P.2d 888, 897 (1985) ("Once the legislature has spoken on the social issue involved [e.g., "public use" determination by legislature in eminent domain proceedings] . . . the legislative . . . declaration should be upheld unless it is palpably without reasonable foundation"; crucial inquiry is whether the legislature "rationally could have believed" its conclusion). As previously noted, the Director acknowledges that the legislative findings are entitled to substantial deference. The relevant legislative findings provide:

Findings and purpose.

. . . .

It is necessary for the State and the counties to make certain sacrifices today in order to build a world-class convention center, and ensure Hawaii's place as one of the world's prime visitor destinations tomorrow. *The State and the counties will benefit from future increases in convention-related business, which will add an estimated $335,000,000 a year in new tax revenues.* Conversely, future decreases in convention-related business because of the lack of a convention center will result in less revenues being generated through the general excise tax and transient accommodations tax and less moneys for the State and the counties alike.

The transient accommodations tax is derived primarily from visitors from outside of the State and convention travelers comprise a significant portion of these visitors. *The legislature finds that a convention*

*center would stimulate economic activity in the visitor industry and the resulting increase in revenue from the transient accommodations tax and the general excise tax will be substantially attributable to the presence of a convention center.* The legislature further finds that the construction and operation of a convention center are crucial to the economic well-being of the State and the counties and are for a public purpose.

Act 7, § 11 (emphasis added).

Finally, we believe that perceiving a relationship between a proposed convention center and TAT revenues comports with common sense. Prospective conventioneers invariably would need places to stay while attending functions conducted at the convention center. Given that the convention center's proposed location must be close to Waikiki, *see* Act 7, § 1,[13] at the very least, Waikiki hotels will undoubtedly experience increased occupancy from conventioneers. Moreover, as the Director acknowledges, studies indicate that, as a collateral benefit of the convention center, satellite conventions could be expected on the neighbor islands. *See Convention Center: Hearings on S.B. No. 1331, Relating to Making an Appropriation to Study Convention Market Potential and Satellite Convention Facility Sites in West Hawaii,* 17th State Legislature, Special Sess. (Testimony of Donald M. Takaki, Chair, Convention Center Authority).[14]

We therefore hold that the proposed convention center bears a rational causal relationship to TAT revenues. In combination with our earlier conclusion that construction of the proposed convention center need not be completed in order for the earmarked portion of the TAT involved in the financing of the convention center to qualify as a "user tax," we hold that the TAT qualifies as "user tax" as defined in article VII, section 12(9) of the Hawai'i Constitution. Accordingly, the revenue bonds authorized by the 1993 legislature to finance the proposed convention center are excludable from the debt limit pursuant to article VII, section 13(2) of the Hawai'i Constitution.

**4. Clear Constitutional History Demonstrates that the Delegates to the 1968 Constitutional Convention Were Sensitive to the Risks Inherent in Excluding General Obligation Debt For "New and Unproved" Types of Revenue–Producing Undertakings From the Constitutional Debt Limit.**

Our holding that the TAT qualifies as a "user tax" and that the revenue bonds are accordingly exempt from the constitutional debt limit does not resolve the remaining question—whether the *reimbursable general obligation bonds* authorized by the 1993 legislature qualify for exclusion under article VII, section 13(6) of the Hawai'i Constitution.

As previously noted, in response to the *Ho* decision, the constitutional debt limitation

---

13. Act 7, § 1 provides in pertinent part:
   The legislature finds that existing convention facilities in Hawaii are inadequate for the needs of many convention groups. *The legislature declares that any convention center facility should be centrally located within or near Waikiki* to best address the needs of prospective conventioneers, and that the most appropriate existing sites are what is popularly known as the Aloha Motors site and what is popularly known as the Ala Wai golf course site. *These sites are located near the visitor hub of Waikiki, surrounded by several major hotels and in walking distance from many other hotels. In this context, a convention center is presented with the capacity to act in synergism with the surrounding uses.* Building a convention center facility at either of these sites would serve the purpose of providing an easily accessible convention center.
   *Id.* (emphasis added).

14. Chairman Takaki's testimony provides in pertinent part:
   [W]e wish to share with the members of the committee some thoughts on the concept of a satellite convention facility in West Hawaii. First, when a world-class facility is built on Oahu, the opportunity for "pre" and "post" convention business will be created for the Neighbor Islands. Many of the large conventions that will utilize the Oahu facility will be comprised of numerous smaller groups. *It is not uncommon for these groups to want to hold their own conventions for several days before or after the larger meetings in Honolulu. Therefore, working in synergy with the marketing arm of the Oahu convention center facility could be more convention-type activities for the entire state.*
   (Emphasis added.)

provision was amended significantly in 1968. While seeking to "set limits that are sufficiently liberal as to permit adequate financing of future capital improvements but that at the same time provide assurance to investors that their investments in Hawaiian municipal securities are safe[,]" 1 Proceedings of the Constitutional Convention of Hawai'i of 1968, at 221 (1973), the delegates to the constitutional convention also sought to strike an appropriate balance between flexibility and security.

This movement toward increased flexibility was most notably evinced in two ways. First, as noted above, the definition of revenue bonds was broadened to address this court's holding in *Ho*, such that revenue bonds were to be exempt from debt limit calculations if the bonds were secured by a special fund funded in part by user taxes. Second, reimbursable general obligation bonds were exempted from the debt limit under specific circumstances.

The advent of the reimbursable general obligation bond afforded much greater flexibility to the state's financing capabilities. The reimbursable general obligation bond, in essence, is a hybrid of the revenue and general obligation bonds, possessing the most favorable characteristics of both: it is both secured by specific financing sources and thus excluded from the debt limit (as are revenue bonds) and is secured by the full faith and credit of the state (as are general obligation bonds). The advantage of using reimbursable general obligation bonds, as the delegates to the constitutional convention of 1968 noted, was primarily that bonds backed by the full faith and credit of the state are perceived to be more secure, and therefore the state may pay a lower rate of interest, thereby substantially reducing overall debt service charges. In Part A.1., "Provisions applicable to both state and county debt," of Standing Committee Report No. 52, the Committee reported:

The purpose of this provision is to encourage the use of general obligation bonds instead of revenue bonds. A self-sustaining activity of the government (such as the Harbor Division) can issue revenue bonds (secured solely by the revenues of the division), but revenue bonds usually sell at about 1% higher interest rate than general obligation bonds—perhaps these days the difference being between 5½% interest and 4½% interest. A 1% interest rate differential on a twenty-year $10 million bond would cost about $1 million over the life of the bond. Since the State would in any case undoubtedly stand behind harbor revenue bonds rather than see them in default, the full faith and credit of the State might just as well be pledged in the first place—with sizable interest savings. This could be done today, except that charging these reimbursable general obligation bonds against the state debt limit encourages the legislature to protect its debt margin by issuing revenue bonds which do not count against the debt ceiling. This encouragement is indicated by the fact that there are today outstanding revenue bonds of some $33 million and authorized but unissued revenue bonds of some $111 million.

1 Proceedings of the Constitutional Convention of Hawai'i of 1968, at 221 (1973). However, this movement toward flexibility was not without limitation. Most importantly, the delegates were particularly wary of the implications of pledging the full faith and credit of the state behind an undertaking that was not "self-sustaining" or whose revenues, and/or the user taxes derived from the undertaking, could not cover the debt service charges. In describing the provisions proposed to achieve the Committee's objective, Part A.1. of its standing committee report states:

1. That issued and outstanding general obligation debt for an undertaking supported by user revenues and/or user taxes shall be excluded from the debt limits to the extent that (after operating, maintenance and other related costs) net user revenues and/or user taxes make the undertaking *self-sustaining* so that all debt service charges will be met. *The determination of being "self-sustaining" will be by law based upon the financial record of the undertaking in the prior fiscal year.* Debt reimbursable to the State by the counties falls into this category.

Thus, in accord with the concern that public undertakings be "self-sustaining," the 1968 delegates incorporated language in the provision providing for the excludability of reimbursable general obligation bonds from the debt limit to the extent that "reimbursements are in fact made from the net revenue, or net user tax receipts, or combination of both, as determined for the immediately preceding fiscal year." Haw. Const. art. VII, § 13(6). In other words, the amounts that are not directly reimbursed to the general fund by revenue and/or user taxes are not excludable from the debt limit. This compromise position carefully balances the competing interests of flexibility and security.

Of particular concern to the 1968 delegates, however, and most relevant to the present case, was the most risk-laden of the projects that were potentially not "self-sustaining"—inchoate and unproved undertakings that were sufficiently dissimilar to existing public undertakings as to render their future economic performance and sustainability especially speculative. The solution crafted by the 1968 delegates was to include reimbursable general obligation bonds in the calculation of the state's constitutionally mandated debt limit until any given revenue-generating undertaking had been in actual operation for at least one fiscal year, so as to allow for secure exclusion of substantiated amounts of debt. In Part A.3. of Standing Committee Report No. 52, the Committee reported:

> The outstanding general obligation debt *for new and unproved types of revenue-producing undertakings* (such as a possible interisland surface ferry, a hovercraft activity, a mass rapid transit system) *will be counted against the respective debt ceilings until such time as the revenue-producing capabilities of the enterprise are established, which must be at least one full year of operations.*

> Although this descriptive provision is not necessary, since it would be covered by point A–1,[15] *its purpose is to emphasize that under no circumstances would general obligation debt undertaken for a new and unproven undertaking be ex-*

*cludable from the debt limit.* This prohibits the use of *forecasted* revenues to permit an exclusion of debt for such a new undertaking.

1 Proceedings of the Constitutional Convention of Hawaii of 1968, at 222 (1973) (emphasis added).

■ It is evident from the above-quoted passage that the 1968 delegates were not only aware of, but were particularly concerned with, compromising the financial security of the state in the case of "new and unproved" public undertakings. In the present case, it is undisputed that the convention center is not yet constructed and therefore has not been in actual operation for at least one fiscal year; thus, it is obviously a "new and unproved" proposed public undertaking as contemplated by the 1968 delegates. Accordingly, it is clear that, in order for the reimbursable general obligation bonds authorized by the legislature to be excludable from the debt limit, the convention center must be "self-sustaining," as measured by its first year of operation. It therefore follows, and we so hold, that the reimbursable general obligation debt at issue in this case is not excludable until the proposed convention center has been constructed and in operation for at least one fiscal year.

### 5. Case Law From Other Jurisdictions is of Little Relevance.

All of the parties cite to a plethora of inapposite authority from other jurisdictions in support of their respective positions. Much of the impetus behind the instant litigation stemmed from the state Bond Counsel's reluctance to certify that the bonds involved in the present case were not subject to the debt limit in light of an Indiana Supreme Court decision purportedly holding that the TAT is not a "user tax":

> We note that the preliminary advice of the State's Bond Counsel is that because there exists a court case in Indiana stating that TAT is not a user tax, Bond Counsel would have difficulty issuing an opinion indicating that such bonds would be excluded from the debt limitation of the State. Also be-

**15.** "Point A–1" refers to Part A.1. of Standing Committee Report No. 52 previously quoted.

cause the State of Hawaii Constitution implies that the revenues used as security for reimbursable general obligation bonds be derived from the undertaking, the Indiana case presents a problem. As such, we would recommend that the committee provide language in the bill allowing for the Hawai'i Supreme Court to hear this matter on an original jurisdiction basis so that a determination can be made as to the applicability of issuing revenue bonds or reimbursable general obligation bonds pledging TAT revenue to the issue.

Testimony of Yukio Takemoto, Director, Department of Budget and Finance, State of Hawai'i, to the House Committee on Finance on Senate Bill No. 1863, S.D. 2, H.D. 1, April 1, 1993.

The Indiana case referred to in the Director's testimony is *Eakin v. State ex rel. Capital Improvement Board of Marion County*, 474 N.E.2d 62 (Ind.1985). In *Eakin*, the Indiana General Assembly had enacted a series of statutes that provided a mechanism for the financing of the proposed expansion of the Indianapolis Convention Center. The revenue scheme authorized by the statutes consisted of three separate excise taxes: (1) a one percent tax on the sale of food and beverages sold for immediate consumption on or near the convention center at retail establishments in Marion County; (2) a five percent tax on admissions to professional sporting events held in the convention center; and (3) a hotel/motel tax. The revenues collected under these taxes were placed in a trust fund, which, together with the operating revenues of the convention center, were the only funds pledged to the retirement of the construction bonds. The Capital Improvement Board of Marion County, Indiana, (CIB) then sold construction bonds in excess of $47,000,-000. In 1984, in response to lower interest rates, the CIB sought to refinance the 1982 bonds by the issuance of two new series of bonds. After approval by the mayor, the County Auditor, Eakin, refused to affix his signature to the bonds and the CIB brought suit to compel Eakin to comply. The trial court granted judgment in favor of the CIB. Eakin appealed, and the Indiana Supreme Court reversed.

First noting that article 13, section 1 of the Indiana Constitution limited the indebtedness of any political or municipal corporation in the State to two percent of the value of the taxable property within the corporation, the *Eakin* court noted that there were a number of financial liabilities in the public domain that were not included within the term "indebtedness" contained in article 13 of the Indiana Constitution. One such category was debts within the "special taxing district" exception, which in turn has been subdivided into two exceptions, the "Special Funds" doctrine and the revenue bond exception. The revenue bond exception provided that bonds that were to be paid solely from a fund created by revenues from the project for which the bonds were sold were exempt from the constitutional debt limit. The *Eakin* court agreed with the CIB's argument for inclusion of taxes on revenues, in essence user taxes, in the definition of "revenue" for purposes of exclusion of debt from the debt limit, "as long as there exists a nexus between the revenue taxed and the project for which the bonds were issued." *Id.* at 66. The court, however, did not agree with the CIB's second argument for expansion of the revenue bond exception because the revenue from the second two types of taxes—the tax on the retail food service industry and the hotel/motel tax—could not properly be attributed as income of the Indianapolis Convention Center. The *Eakin* court noted:

> The CIB fails in its second expansion of the revenue bond rule. The CIB classifies as revenue, for the purpose of this revenue tax, the income from the hotel/motel industry and the retail food service industry of Marion County. The CIB maintains the income of these groups is properly attributable as income of the Indianapolis Convention Center and thus subject to a revenue tax discussed above. Economic impact studies do indicate a significant increase in the sale of these two segments of the economy as a result of the expansion. *However, to argue all retail food and lodging income in Marion County is directly or indirectly related to the existence of an expansion of a preexisting facility is untenable. These industries predated the facility and they would continue if the In-*

*dianapolis Convention Center were to close tomorrow. We hold the tax on the revenue of the hotel/motel and retail food businesses of Marion County do not have a sufficient nexus to the operation of the center to be classified as revenue of the Indianapolis Convention Center and thus meet the requirement of the exception.*

*Id.* at 66–67 (emphasis added).

*Eakin* is distinguishable from the present case in two important ways. First, the holding in *Eakin* was premised largely on the fact that the *entirety* of the taxes involved went toward financing the improvement of the Indianapolis Convention Center. As indicated by the quotation above, the *Eakin* court held that the tax on the revenue of the hotel/motel and retail food businesses in the Marion County area did not have a sufficient nexus to the convention center because "to argue *all* retail food and lodging income in Marion County is directly or indirectly related to the existence of an expansion of a preexisting facility is untenable." *Id.* at 66 (emphasis added). In the present case, however, only one-sixth of the TAT revenue is dedicated toward the financing of the convention center.

Second, unlike Hawai'i's Constitution, which contains several express provisions for various types of debts excludable from the debt limit, the entirety of the Indiana Constitution's provisions regarding municipal debt consisted of a single broadly worded section:

§ 1. Limitation on indebtedness—Excess void.—No political or municipal corporation in this State shall ever become indebted in any manner or for any purpose to an amount in the aggregate exceeding two per centum on the value of the taxable properly within such corporation, to be ascertained by the last assessment for State and county taxes, previous to the incurring of such indebtedness; and all bonds or obligations, in excess of such amount, given by such corporations, shall be void: Provided, That in time of war, foreign invasion, or other great public calamity, on petition of a majority of the property owners, in number and value, within the limits of such corporation, the public authorities, in their discretion, may incur obligations necessary for the public

protection and defense to such amount as may be requested in such petition.

Ind. Const. art. XIII, § 1. As a result, all of the "exceptions" to the debt limit contained in the Indiana Constitution were products of judicial interpretation of the term "indebtedness," insofar as the types of debt judicially determined to be outside the definition of "indebtedness" were not subject to the debt limitation. *See Eakin,* 474 N.E.2d at 65. The generality of the terms of the Indiana Constitution, therefore, inherently accorded wider discretion upon the Indiana courts in their interpretations. The Hawai'i Constitution's provisions regarding exclusions from the debt limit, on the other hand, are specific enumerated exceptions, precisely crafted to cover particular circumstances, and are supported by a correspondingly specific constitutional intent to which we must fastidiously adhere. *Eakin,* therefore, is inapposite to the issue at hand and does not control our interpretation of the Hawai'i Constitution.

### III. *CONCLUSION*

Based on the foregoing, we hold that: (1) the one percent increase in the TAT earmarked for financing the expenses associated with the development and construction of a state convention center is "substantially derived" from the convention center and, therefore, qualifies as a "user tax"; and (2) because the earmarked portion of the TAT qualifies as a "user tax," the revenue bonds, authorized by the 1993 Hawai'i State Legislature pursuant to Act 7, section 24 for the development and construction of the proposed convention center, qualify for exclusion from the debt limit mandated by article VII, section 13 of the Hawai'i Constitution. The aforementioned holdings notwithstanding, we further hold that the reimbursable general obligation bonds, authorized by the legislature pursuant to Act 7, section 23 for the development and construction of the proposed convention center, do not qualify for exclusion under article VII, section 13(6) of the Hawai'i Constitution because the convention center has not been constructed and in actual operation for at least one fiscal year.