NO. 29060

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAI'I

STATE OF HAWAI'I, Plaintiff-Appellee,
vs.
BARRY SILVER, Defendant-Appellant

APPEAL FROM THE CIRCUIT COURT OF THE SECOND CIRCUIT
(CR. NO. 05-1-0282(3))

MEMORANDUM OPINION
(By: Nakamura, Chief Judge, Foley, and Leonard, JJ.)

Defendant-Appellant Barry Silver (Silver) appeals from the Judgment entered by the Circuit Court of the Second Circuit (circuit court).[1] Plaintiff-Appellee State of Hawai'i (State) charged Silver by indictment with five counts of third degree sexual assault, in violation of Hawaii Revised Statutes (HRS) § 707-732(1)(b) (Supp. 2009).[2] The complaining witness (Minor)

---

[1] The Honorable Joseph E. Cardoza presided.

[2] HRS § 707-732(1)(b) provides:

§ 707-732 Sexual assault in the third degree. (1) A person commits the offense of sexual assault in the third degree if:

. . . .

(b)     The person knowingly subjects to sexual contact another person who is less than fourteen years old or causes such a person to have sexual contact with the person[.]

HRS § 707-700 (Supp. 2009) defines the term "sexual contact" as follows:

"Sexual contact" means any touching, other than acts of "sexual penetration", of the sexual or other intimate parts of a person not married to the actor, or of the sexual or other intimate parts of the actor by the person, whether directly or through the clothing or other material intended to cover the sexual or other intimate parts.

After the time period of the alleged offenses, the definition of "sexual penetration" was amended in ways not material to this appeal. See 2006 Haw. Sess. Laws Act 230, § 26
(continued...)

was eleven years old at the time of the alleged offenses and Silver was forty-six years old. The indictment alleged that "during or about the period of July 16, 2004, through July 17, 2004, inclusive," Silver did knowingly subject Minor, who was less than fourteen years old, "to sexual contact or cause him to have sexual contact" with Silver by: touching Minor's buttocks (Count 1); touching Minor's penis (Count 2); touching Minor's buttocks (Count 3); touching Minor's penis (Count 4); and touching Minor's buttocks (Count 5).

The charges against Silver arose out of a vacation trip he took from Florida to Hawai'i, where he stayed at a condominium along with Minor and Minor's father, who were on vacation from Washington. Silver and Minor's father had not previously met, but they were former students of the owner of the condominium.

Prior to trial, the circuit court issued an order granting Silver's motion for a bill of particulars. The circuit court incorporated the State's response to Silver's motion as an exhibit to its order. The State's response clarified that Count 1 alleged "conduct that occurred at the pool"; Counts 2 and 3 alleged "conduct that occurred during the first 'massage' perpetrated by [Silver] on [Minor]"; and Counts 4 and 5 alleged "conduct that occurred during the second 'massage' perpetrated by [Silver] on [Minor]."

After the close of the evidence, the circuit court granted Silver's motion for judgment of acquittal as to Count 2. The jury subsequently returned verdicts of guilty as to the remaining counts--Counts 1, 3, 4, and 5. The circuit court sentenced Silver to concurrent terms of five years of imprisonment on each of these counts.

On appeal, Silver asserts that the circuit court erred by: 1) refusing to dismiss the indictment because the prosecutor failed to tender "clearly exculpatory" evidence of Minor's

2/ (...continued)
at 1013-14.

2

inconsistent statements to the grand jury; 2) refusing to admit, on the ground of lack of foundation, extrinsic evidence proffered by the defense of Minor's prior inconsistent statement to an investigator; 3) allowing expert testimony regarding the behavior of child sex abuse victims, because such testimony was tantamount to an opinion that Minor was telling the truth; 4) finding that the prosecutor's statements during closing argument did not constitute prosecutorial misconduct; 5) failing to conduct a timely hearing on Silver's allegations that a juror was sleeping during trial and denying Silver's motion for a new trial based on that allegation; and 6) determining that there was sufficient evidence to support the guilty verdicts. Silver further contends that if it is determined that there was sufficient evidence to support his convictions, then HRS § 707-700, the statute which defines "sexual contact," is void for vagueness.

For the reasons discussed below, we affirm Silver's convictions.

BACKGROUND

I. Trial Evidence

The following is based on the evidence presented at trial. Minor's father and Minor traveled from Seattle to Maui for a vacation. During their trip, Minor's father and Minor stayed with Alan and Vickie Josefsberg. Alan Josefsberg was the former teacher of Minor's father. When Minor's father and Minor arrived at Alan Josefsberg's condominium, they met Silver. Silver, also a former student of Alan Josefsberg, happened to be visiting Maui and staying with the Josefsbergs during the same time as Minor's father and Minor. Neither Minor's father nor Minor knew Silver prior to this meeting. However, Minor's father, Minor, and Silver spent significant time together on the trip.

At one point, Minor's father, Minor, and Silver were swimming together at the condominium pool. Minor referred to an incident at the pool when asked at trial whether there were times

he felt Silver had touched him inappropriately. Minor testified as follows:

> [Minor]: And then we were like messing around in the pool, and then [Minor's father and Silver] were kind of like throwing me back and forth. And my dad would pick me up like from like right here (indicating) and kind of like toss me. And then [Silver] would kind of like hold under my butt to like hoist me up and throw me, but I don't remember like him grabbing me or anything.
>
> [Prosecutor]: And what part of your body did he touch?
>
> [Minor]: Kind of like my crotch to throw me or under my butt to throw me.

Minor's father testified that he "saw a lot of physical contact in the pool" between Silver and Minor, but did not see any "[a]ctual sexual contact." However, Minor's father "wouldn't have known" if Silver "ever had his hands underneath Minor's behind" because Minor's father "had trouble seeing a lot of times because of just the water . . . splashing up."

A few days into the trip, the sleeping arrangements in the condominium changed. Originally, Minor's father and Minor were sharing a pull-out bed that unfolded from a couch, while Silver was sleeping on a cot in a separate room. However, Silver moved from sleeping on the cot to sleeping on an extension of the couch adjacent to the pull-out bed. Silver claimed that he had a "bad back" and that "his back was getting even worse because of the lousy cot he was sleeping on." Minor's father slept on the far end of the pull-out bed, and Minor slept on the side of the bed adjacent to the couch extension where Silver was now sleeping, in between Silver and Minor's father.

According to Minor, one night when Silver was sleeping next to him on the couch extension, Silver woke him up around midnight. Silver was rubbing Minor's back, whispered in Minor's ear to "scoot closer," and told Minor, "shh, don't wake anybody up." Minor described the subsequent events as follows:

> [Prosecutor]: . . . Okay. And you said you felt him touching you. Where did you feel his hand first?

4

[Minor]: Well, first it kind of was like on my arm and stuff, and I think I was on my stomach first. And then [Silver] kind of like moved to my back, and he was rubbing my back and stuff, and I wasn't really thinking anything that much. And then the -- I was like, all right. It's okay. I'm going to go to bed now.

And I kind of scooted away and kind of like fell back asleep for a couple minutes. And then I woke up, and he was like rubbing me again. And this time I was kind of like on my side and so --

. . . .

[Minor]: Yeah, [Silver's] on the sofa the whole time, and he was rubbing me. And then he rubbed like my arms and stuff. I was -- kind of moved to my stomach again, and he rubbed like down on my lower back.

. . .

[Minor]: Kind of like then I shifted all the way onto my stomach, and then [Silver] kind of like rubbed and kind of went lower onto my back, and then kind of like brushed over my butt really slow. And then he kind of like stopped and like rubbed somewhere else again like up here (indicating).

And then I was like okay, well, I'm just going to go to bed now. And then I kind of like went back and then like scooted closer to my dad a little bit and kind of fell back asleep for a couple minutes. And then I woke up again with him rubbing me, but this time I was on my back, and he's kind of like rubbing my arm and stuff.

And then he I had kind of like shifted or something and then somehow he brushed over my crotch and my penis and came up, and then he was like rubbing -- I was like, all right, look, I want to go to bed now, and scooted all the way close to my dad, and now I kind of just like fell back asleep. And then I don't remember anything happening after that.

Minor stated that the first time Silver was rubbing him, Silver did not touch Minor's buttocks or penis. Minor testified that after he dozed off and was reawakened, Silver was "kind of rubbing my back and then goes lower and rubs over my butt but doesn't like massage it, just brushes over it."[3] Minor explained that while Silver was massaging or "rubbing" Minor's back and arms, "it seemed like [Silver] just kind of brushed over

_____

[3] Minor stated that he used the term "massage" to mean "like using, like, your fingers, like, to push harder and soft." Minor testified that he had received back massages from his parents before, but, unlike Silver, his parents did not "brush over any of [his] private areas."

5

the other areas." In response to the prosecutor's question over whether Silver's brushing over the other areas seemed on purpose or accidental, Minor responded:

> Well, for the first time it seemed like he might have done it on accident, but towards the second and third time that he did it, it seemed like he did it more on purpose because it's kind of just like weird because it -- he did it again. Because each time he did it, I kind of jerked away a little because I didn't know if he was accidentally doing it because it was really dark.

When asked to elaborate on his testimony that Silver had touched his "penis area," Minor stated:

> [Minor]: . . . I remember during the back rub he rubbed over my penis. He didn't rub it. He just kind of brushed it.
>
> [Prosecutor]: Okay. So not rubbing with his finger?
>
> [Minor]: Yeah, just kind of slowly brushed over it.
>
> [Prosecutor]: Did that seem accidental? Inadvertent? On purpose? Could you describe it?
>
> [Minor]: Well, like the speed of him brushing over it, it seemed like he did it on purpose.
>
> [Prosecutor]: How fast was it?
>
> [Minor]: It was just kind of like -- just kind of like this (indicating). It wasn't quick like that. It was just like slow.

Minor testified that he thought that the slow brushing happened "once on my penis and twice on the butt . . . ."

Minor's father was sleeping next to Minor when the alleged massages occurred, but Minor did not tell his father until the following morning. Upon hearing Minor's accusation, Minor's father talked to Vickie and Alan Josefsberg. Minor's father also called the police and filed a complaint. Minor's father and Minor moved to a hotel, and Minor's father changed their flight arrangements and left Maui early.

II. Procedural History

Prior to trial, Silver moved to dismiss the indictment on the ground that the prosecutor failed to present "clearly exculpatory evidence" to the grand jury. The circuit court denied the motion.

When the State rested after its case in chief at trial, Silver moved for judgment of acquittal on all five counts, which the court denied. Silver then rested, electing not to call any witnesses, and renewed his motion for judgment of acquittal. The circuit court, after reviewing the trial transcripts, granted Silver's motion as to Count 2.

On January 29, 2007, Silver filed a Motion for New Trial. On March 27, 2008, the circuit court entered findings of fact, conclusions of law, and an order denying Silver's Motion for New Trial.

STANDARDS OF REVIEW

A.   Motion to Dismiss Indictment

"A trial court's ruling on a motion to dismiss an indictment is reviewed for an abuse of discretion." State v. Mendonca, 68 Haw. 280, 283, 711 P.2d 731, 734 (1985). "Dismissal of an indictment is required only in flagrant cases in which the grand jury has been overreached or deceived in some significant way, as where perjured testimony has knowingly been presented . . . ."   Id. (internal quotation marks and citations omitted).

B.   Evidentiary Rulings

With regard to evidentiary rulings,

> different standards of review must be applied to trial court decisions regarding the admissibility of evidence, depending on the requirements of the particular rule of evidence at issue. When application of a particular evidentiary rule can yield only one correct result, the proper standard for appellate review is the right/wrong standard. However, the traditional abuse of discretion standard should be applied in the case of those rules of evidence that require a "judgment call" on the part of the trial court.

Kealoha v. County of Hawaii, 74 Haw. 308, 319-20, 844 P.2d 670, 676 (1993).

A trial court's decision on whether to admit opinion testimony is subject to review for abuse of discretion. State v. Toyomura, 80 Hawai'i 8, 23-24, 904 P.2d 893, 908-09 (1995). "Generally, to constitute an abuse of discretion, it must appear that the trial court clearly exceeded the bounds of reason or

7

disregarded rules or principles of law or practice to the substantial detriment of a party litigant. Id. at 24, 904 P.2d at 909 (internal quotation marks, citation, and brackets omitted).

### C. Prosecutorial Misconduct

> Allegations of prosecutorial misconduct are reviewed under the harmless beyond a reasonable doubt standard, which requires an examination of the record and a determination of whether there is a reasonable possibility that the error complained of might have contributed to the conviction.
>
> Prosecutorial misconduct warrants a new trial or the setting aside of a guilty verdict only where the actions of the prosecutor have caused prejudice to the defendant's right to a fair trial. In order to determine whether the alleged prosecutorial misconduct reached the level of reversible error, we consider the nature of the alleged misconduct, the promptness or lack of a curative instruction, and the strength or weakness of the evidence against defendant.

State v. Mars, 116 Hawai'i 125, 133, 170 P.3d 861, 869 (App. 2007) (citations and internal quotation marks omitted)

### D. New Trial

"As a general matter, the granting or denial of a motion for new trial is within the sound discretion of the trial court and will not be disturbed absent a clear abuse of discretion. The same principle is applied in the context of a motion for new trial premised on juror misconduct. State v. Yamada, 108 Hawai'i 474, 478, 122 P.3d 254, 258 (2005).

### E. Sufficiency of the Evidence

> In reviewing the sufficiency of the evidence, we view the evidence in the light most favorable to the prosecution. The test on appeal is not whether guilt is established beyond a reasonable doubt, but whether there was substantial evidence to support the conclusion of the trier of fact. . . . . "Substantial evidence" is credible evidence which is of sufficient quality and probative value to enable a person of reasonable caution to support a conclusion. . . . It is the province of the jury, not the appellate courts, to determine the credibility of witnesses and the weight of the evidence.

State v. Smith, 106 Hawai'i 365, 372, 105 P.3d 242, 249 (App. 2004) (citations, internal quotation marks, and ellipsis points omitted; block quote format changed).

F.    Constitutionality of Statute

"We answer questions of constitutional law by exercising our own independent judgment based on the facts of the case. . . . Thus, we review questions of constitutional law under the 'right/wrong' standard." State v. Fields, 115 Hawai'i 503, 511, 168 P.3d 955, 963 (2007) (citation omitted and ellipsis in original).   The Hawai'i Supreme Court has "long held that: (1) legislative enactments are presumptively constitutional; (2) a party challenging a statutory scheme has the burden of showing unconstitutionality beyond a reasonable doubt; and (3) the constitutional defect must be clear, manifest, and unmistakable." Convention Ctr. Auth. v. Anzai, 78 Hawai'i 157, 162, 890 P.2d 1197, 1202 (1995) (internal quotation marks, citation, and brackets omitted).

DISCUSSION

I.

Silver argues that the circuit court abused its discretion in denying his motion to dismiss the indictment (Motion to Dismiss).   Silver's Motion to Dismiss alleged that the prosecutor "failed and/or omitted to present clearly exculpatory evidence to the Grand Jury."   The evidence specifically identified and attached as exhibits to the Motion to Dismiss was the affidavits of Alan Josefsberg and his wife, Vickie Josefsberg.   On appeal, Silver argues that in addition to the Josefsbergs' affidavits, the prosecutor should have presented statements Minor made to his father, Broward County School Board officials in Florida, and the King County police in Washington to the grand jury.[4/]

Silver argues that the inconsistencies in Minor's statements constituted clearly exculpatory evidence that would have negated guilt on four counts of the five-count indictment and that if the statements had been provided to the grand jury,

_____

    [4/] Silver was apparently a school teacher in Broward County, Florida at the time of the charged offenses, and Minor was a resident of Washington.

"it would probably have issued a no bill." We disagree with Silver's contention that the circuit court abused its discretion in denying his Motion to Dismiss.

A.

In <u>State v. Bell</u>, 60 Haw. 241, 243-44, 589 P.2d 517, 519 (1978), the Hawai'i Supreme Court quoted the following passage from <u>United States v. Clandra</u>, 414 U.S. 338, 343-44 (1974), regarding the nature of grand jury proceedings:

> A grand jury proceeding is not an adversary hearing in which the guilt or innocence of the accused is adjudicated. Rather, it is an Ex parte investigation to determine whether a crime has been committed and whether criminal proceedings should be instituted against any person.

The Hawai'i Supreme Court stated that "[t]o require the prosecutor to present any and all information which may have a tendency to exculpate the accused would, in our view, confer upon grand jury proceedings the adversary nature which is more properly reserved for the actual trial phase of prosecution." <u>Bell</u>, 60 Haw. at 244, 589 P.2d at 519.

The supreme court held that "the prosecution is required only to present to the grand jury evidence which is clearly exculpatory in nature." <u>Id.</u> at 242, 589 P.2d at 518. The supreme court gave the following examples of clearly exculpatory evidence:

> Clearly exculpatory evidence may be manifested, for example, by a witness whose testimony is not directly contradicted by any other witness and who maintains that the accused was nowhere near the scene of the crime when it occurred. Also, where it has become apparent to the prosecution, for example, that a sole eyewitness testifying as to the perpetration of the crime has perjured himself before the grand jury, that perjury must be revealed to the grand jury.

<u>Id.</u> at 245, 589 P.2d at 520.

A court should dismiss an indictment only when the prosecution failed to present evidence that "would have negated guilt or undermined the authority of the grand jury to act at all . . . ." <u>Id.</u> at 247, 589 P.2d at 521 (quoting <u>United States v. Mandel</u>, 415 F. Supp. 1033, 1041-42 (D. Md. 1976)). "The prosecution is not required to produce before the grand jury all evidence which may tend to undermine the credibility of the

10

witnesses presented." Id. at 253-54, 589 P.2d at 525. In Bell, the supreme court held that the victim's identification of someone other than the defendant at a lineup only reflected upon the victim's credibility in general and did not constitute clearly exculpatory evidence. Id. at 253, 589 P.2d at 525. The supreme court cited with approval cases from other jurisdictions holding that the prosecution was not required to present evidence of a witness's inconsistent statements to the grand jury, because such evidence bore on the witness's credibility and could be explored by both sides at trial. Id. at 254-55, 589 P.2d at 525.

B.

At the outset, we note that Silver only preserved his argument with respect to the State's failure to present the Josefsbergs' affidavits to the grand jury. Those were the only statements that Silver specifically identified and attached as exhibits to his Motion to Dismiss and that he argued to the circuit court at the hearing on his Motion to Dismiss. In later denying Silver's motion for a new trial, the circuit court ruled that because Silver did not challenge the State's failure to present Minor's statement to Broward County officials in his Motion to Dismiss, Silver waived any claim related to that statement under Hawaii Rules of Penal Procedure (HRPP) Rule 12.[5]

---

[5] HRPP Rule 12 (1997) provided, in relevant part:

(b) **Pretrial motions.** Any defense, objection, or request which is capable of determination without the trial of the general issue may be raised before trial by motion. Motions may be written or oral at the discretion of the judge. The following must be raised prior to trial:

(1) defenses and objections based on defects in the institution of the prosecution;

(2) defenses and objections based on defects in the charge (other than that it fails to show jurisdiction in the court or to charge an offense which objections shall be noticed by the court at any time during the pendency of the proceedings);

. . . .

(continued...)

11

We agree and also conclude that Silver similarly waived any claims related to Minor's statements to his father and the King County police by not raising them in his Motion to Dismiss. See HRPP Rule 12; see also State v. Hoglund, 71 Haw. 147, 150, 785 P.2d 1311, 1313 (1990) ("Generally, the failure to properly raise an issue at the trial level precludes a party from raising that issue on appeal.").[6]

C.

Minor's father talked separately with Vickie and Alan Josefsberg after Minor disclosed to Minor's father what Silver had done. The affidavit of Vickie Josefsberg stated in relevant part:

> [Minor's father] approached me and stated that [Minor], his 11-year old son, told him that Barry Silver had behaved inappropriately with him. I spoke with [Minor's father] & [Minor] and all [Minor] said to me was that, "[Silver] kept rubbing my back."

The affidavit of Alan Josefsberg stated in relevant part:

> [Minor] claimed that [Silver] rubbed his back and that his hand crossed over his buttocks and thigh. [Minor] said that he told [Silver] to stop, but [Silver] continued rubbing his

---

[5] (...continued)
    (f) **Effect of failure to raise defenses or objections.** Failure by a party to raise defenses or objections or to make requests which must be made prior to trial, within the time set by the court pursuant to section (c), or within any extension thereof made by the court, shall constitute waiver thereof, but the court for cause shown may grant relief from the waiver.

(Emphases added.)

[6] We are not persuaded by Silver's argument that he did not waive the right to challenge the State's failure to provide the grand jury with Minor's statements to his father, Broward County officials, and the King County police because those statements were included as exhibits to Silver's motion for bill of particulars, which was filed nine months before his Motion to Dismiss. Silver did not specifically raise these statements as bases for his Motion to Dismiss. Thus, the circuit court was not informed that Silver was relying on these statements to support his Motion to Dismiss. The mere fact that these statements were made available to the circuit court in connection with a different motion was not adequate to preserve Silver's right to rely on the statements to attack the circuit court's denial of his Motion to Dismiss on appeal.

back.   I asked [Minor] if [Silver] touched any other
inappropriate area and [Minor] said, "No!"

We conclude that the circuit court did not abuse its
discretion in concluding that the Josefsbergs' affidavits were
"not clearly exculpatory, and the Prosecutor was not under an
obligation to present them to the Grand Jury."  The Josefsbergs
did not purport to be eyewitnesses to the alleged incidents of
sexual abuse.  The affidavit of Vickie Josefsberg does not
indicate what questions, if any, she posed to Minor.  Neither
affidavit details the nature and extent of the affiant's
questioning of Minor or whether Minor displayed any reluctance to
speak to or discuss matters with the affiant.  While the
Josefsbergs' affidavits reflect upon Minor's credibility in
general, the circuit court did not abuse its discretion in
concluding that the affidavits did not constitute clearly
exculpatory evidence that the prosecution was required to present
to the grand jury.  See Bell, 60 Haw. at 253-56, 589 P.2d at 525-
26.

Moreover, even if we were to consider the other
statements Silver claims that the State should have presented to
the grand jury, we would conclude that these statements did not
constitute clearly exculpatory evidence.  Minor's prior
statements to his father, Broward County officials, and the King
County police, if presented to the grand jury, would not have
clearly negated Silver's guilt or undermined the authority of the
grand jury to act.  In these prior statements, Minor did not
detail all of the incidents of inappropriate touching he
testified to in the grand jury.  However, these prior statements
all contained allegations by Minor that Silver had touched him
inappropriately.  Minor did not recant his allegations of sexual
abuse.  Although these prior statements could have served to
impeach Minor's credibility, the grand jury need not be advised
of all matters bearing upon a witness's credibility.  See id. at
253-54, 589 P.2d at 525; State v. Pulawa, 62 Haw. 209, 215, 614

P.2d 373, 377 (1980). As such, the State was not required to present these prior statements to the grand jury.[7]

## II.

Silver contends that the circuit court abused its discretion in refusing to admit a transcript of an interview between Minor and a Broward County School Board investigator in which Minor purportedly made a prior inconsistent statement. Silver argues that he laid the proper foundation for the admission of the transcript under Hawaii Rules of Evidence (HRE) Rule 613(b) (1993)[8] and HRE Rule 802.1 (1993).[9] We conclude that Silver did not lay an adequate foundation for the admission

---

[7] Based upon our analysis, we reject Silver's claim that his trial counsel provided ineffective assistance for failing to argue all of Minor's prior statements in support of the Motion to Dismiss.

[8] HRE Rule 613(b) provides, in relevant part:

(b) Extrinsic evidence of prior inconsistent statement of witness. Extrinsic evidence of a prior inconsistent statement by a witness is not admissible unless, on direct or cross-examination, (1) the circumstances of the statement have been brought to the attention of the witness, and (2) the witness has been asked whether the witness made the statement.

[9] HRE Rule 802.1 provides, in relevant part:

The following statements previously made by witnesses who testify at the trial or hearing are not excluded by the hearsay rule:

(1)     Inconsistent statement. The declarant is subject to cross-examination concerning the subject matter of the declarant's statement, the statement is inconsistent with the declarant's testimony, the statement is offered in compliance with rule 613(b), and the statement was:

(A)     Given under oath subject to the penalty of perjury at a trial, hearing, or other proceeding, or in a deposition; or

(B)     Reduced to writing and signed or otherwise adopted or approved by the declarant; or

(C)     Recorded in substantially verbatim fashion by stenographic, mechanical, electrical, or other means contemporaneously with the making of the statement[.]

14

of the transcript, and thus the cirucit court did not abuse its discretion in refuing to admit the transcript.

A.

The issue here involves Silver's cross-examination of Minor during trial. In summary, Silver attempted to impeach Minor by questioning him about a prior inconsistent statement Minor purportedly made under oath during a recorded phone call interview with a Broward County School Board investigator, James Wolischiager (Wolischiager), where Minor allegedly told Wolischiager that Silver did not touch his penis. After Minor testified he did not remember whether he made this statement, Silver attempted to introduce extrinsic evidence of this statement in the form of a transcript of the interview between Minor and Wolischiager. The circuit court refused to admit the transcript because an adequate foundation had not been laid. While Silver frames the issue as whether the foundational requirements of HRE Rule 613(b) and HRE Rule 802.1 were met, we view the issue more simply as whether a sufficient foundation was laid to establish the authenticity of the interview transcript.

On cross-examination by defense counsel, Minor remembered that he got a call from the Broward County School Board special investigation unit. Minor could not recall the name of investigator who interviewed him, nor could he remember much of the content of the interview. Minor agreed with defense counsel that Minor told the investigator that Silver started to rub Minor's back, then moved to down to Minor's butt, and then Minor moved. But when defense counsel asked, "you never said anything about [Silver] touching your penis; correct?", Minor replied, "I'm not sure. I don't remember if I told him or not." Minor further testified, "I don't really remember the phone call. I just remember from who it was."

After repeated questioning by defense counsel about whether Minor remembered what was said during the phone call, Minor was apparently given a copy of the transcript to refresh

15

his recollection, and his testimony continued, in relevant part, as follows:

> [Defense Counsel]: Okay. So you remember speaking to the officer, but you don't remember what was said during the phone call?
>
> [Minor]: Correct.
>
> . . . .
>
> [Defense Counsel]: Okay. Tell the ladies and gentlemen of the jury what the conversation was during those 24 minutes that aren't reflected in the sworn statement that you gave?
>
> [Minor]: I don't remember what was said in the phone call.
>
> [Defense Counsel]: Okay. You don't remember, but you're sure it wasn't them telling you what to say?
>
> [Minor]: Yeah, I remember that I never had that happen.
>
> [Defense Counsel]: But then after the 24-minute break, they started asking you questions under oath again. Do you remember that?
>
> [Minor]: No.
>
> [Defense Counsel]: No, you don't. So you don't recall them telling you that you're still sworn, and you need to tell the truth?
>
> [Minor]: No.
>
> [Defense Counsel]: And you don't recall them asking you did he touch your penis and you saying no?
>
> [Minor]: No.
>
> [Defense Counsel]: Do you recall questions that were asked during the conversation about where Barry Silver touched you allegedly?
>
> [Minor]: No.
>
> [Defense Counsel]: So you don't remember anything about this sworn statement that you gave, but you do remember giving it?
>
> [Minor]: Yeah.

At this point, defense counsel approached the bench and informed the circuit court he planned to move a transcript of the interview into evidence. The State objected, arguing in relevant part:

[Prosecutor]: I object; its hearsay. Number one, its hearsay. Number two, improper foundation. Number three, they can't prove it up through a piece of paper. They have to prove it up through a witness. They have to bring Mr. Wolischiager here and have Mr. Wolischiager testify.

The circuit court sustained the State's objection, explaining:

[Court]: [Minor] does not remember the phone call. On more than one occasion, he said he didn't remember the phone call. He remembered speaking to someone, but he didn't remember the phone call or what was said during the phone call.

. . . I don't think I have a foundation here on the record. Unless there's an agreement of the parties, I don't think I have a foundation that would allow me to receive this statement into evidence. So I'm not going to do it at this point.

. . . .

[Court]: I think the current foundation is lacking. I mean, you can try to supplement it. I don't have a problem with that. But at the present time what I'm dealing with is a witness who really does not -- has not expressed any real recollection of any of this and this would be coming in --

[Defense counsel]: As a prior sworn inconsistent statement.

[Court]: Maybe. But for that matter, given the current foundation, we could be talking about any statement. He doesn't really recall it. There are other ways of getting it in, but given the current foundation or lack of it, I can't receive it.

So I'm going to deny the request. That does not mean it won't ever come in, but given the current foundation, I can't see -- I can't receive it.

Defense counsel made no subsequent attempt to lay more foundation or enter the transcript into evidence.

B.

Based on our review of the record, we conclude that at the time defense counsel attempted to introduce the transcript of the Broward County interview into evidence, there was insufficient foundation laid to authenticate the transcript.

HRE Rule 901 (1993) provides in relevant part:

**Rule 901 Requirement of authentication or identification.** (a) General provision. The requirement of

17

authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims.

As stated by Professor Addison M. Bowman:

The authentication requirement of rule 901 applies to all forms of real and demonstrative evidence and to testimony about telephone conversations and other verbal exchanges not conducted face to face. The general thrust of the rule is to require extrinsic evidence of the item in question. . . .

. . . .

The rule 901 foundation is "evidence sufficient to support a finding that the matter in question is what its proponent claims." The "evidence sufficient" language . . . identifies authentication as a matter of conditional relevancy under rule 104(b), and effects the requirement of extrinsic evidence of authenticity.

Addison M. Bowman, Hawaii Rules of Evidence Manual, § 901-1 and § 901-1[2] (2008-09 ed.).

The transcript Silver sought to introduce purports to be a transcription of a recorded interview. It is not a self-authenticating document under HRE Rule 902 (1993 & Supp. 2009). Regardless of Silver's efforts to satisfy the requirements of HRE Rule 613(b) or HRE Rule 802.1(1), Silver failed to lay a sufficient foundation to authenticate the transcript in question. He failed to present "sufficient to support a finding that the matter in question is what its proponent claims." HRE Rule 901(a). "Transcripts, like other evidence, must be properly authenticated before they can be admitted." United States v. Devous, 764 F.2d 1349, 1354-55 (10th Cir. 1985); see also State v. Joseph, 77 Hawai'i 235, 239, 883 P.2d 657, 661 (App. 1994) ("Simple logic dictates that the party wishing to introduce an item in evidence must present proper proof of its authenticity and identification. In other words, the proponent of the evidence must prove that the item is what the proponent claims it is." (Citations omitted.)).

Here, Minor did not recall the substance of the phone conversation and his testimony did not establish that the purported transcript of the phone conversation accurately

18

reflected the phone conversation.  As the circuit court properly ruled, Minor's testimony did not authenticate the transcript and did not establish a proper foundation for its admission. Therefore, the circuit court did not err in declining to admit the transcript in evidence.[10/]

III.

Silver argues that the circuit court erred in admitting the testimony of Dr. Alexander Jay Bivens, Ph.D. (Dr. Bivens), a clinical psychologist who specializes in the treatment of adolescents.  Dr. Bivens testified about the dynamics of sexual abuse and the reaction of children who have been molested.  His testimony included that children often do not immediately report the sexual abuse and underreport the extent of the abuse.  Silver contends that Dr. Bivens's testimony at trial was improperly admitted because it was tantamout to an opinion that Minor was telling the truth.  We disagree.

Dr. Bivens's testimony was confined to the behavior of child sexual abuse victims in general, the type of testimony which the Hawai'i Supreme Court concluded was admissible in State v. Batangan, 71 Haw. 552, 557-58, 799 P.2d 48, 51-52 (1990).  Dr. Bivens's testimony was based on psychological studies.  He testified that he had never met, seen, interviewed, or evaluated Minor and indicated that he was not familiar with the details of Minor's case.  Dr. Bivens's testimony did not include a specific personal opinion of whether Minor was truthful or believable.

A.

In Batangan, the Hawai'i Supreme Court recognized that "sexual abuse of children is a particularly mysterious

---

[10/] In his points of error, Silver asserts that to the extent the circuit court's ruling was correct, his trial counsel was ineffective for failing to provide the necessary foundation.  Silver, however, presents no argument in support of this point of error, and, accordingly, this point of error is deemed waived.  See Hawai'i Rules of Appellate Procedure (HRAP) Rule 28(b)(7) ("Points not argued may be deemed waived.").  Moreover, Silver does not direct us to evidence in the record that would permit us to determine whether trial counsel had the ability to establish the necessary foundation by other means.

phenomenon, and the common experience of the jury may represent a less than adequate foundation for assessing the credibility of a young child who complains of sexual abuse." Batangan, 71 Haw. at 557, 799 P.2d at 51 (citations and internal quotation marks omitted). The court went on to hold:

> [W]hile expert testimony explaining "seemingly bizarre" behavior of child sex abuse victims is helpful to the jury and should be admitted, conclusory opinions that abuse did occur and that the child victim's report of abuse is truthful and believable is of no assistance to the jury, and therefore, should not be admitted.

Id. at 558, 799 P.2d at 52. The court stated that "[t]he pertinent consideration is whether the expert testimony will assist the jury without unduly prejudicing the defendant." Id.

In Mars, this court quoted with approval the following passage from a decision of the Georgia Court of Appeals:

> [T]here is absolutely nothing wrong with expert opinion testimony that bolster's [sic] the credibility of the indicted allegations of sexual abuse, e.g., the victim's physical examination showed injury consistent with sexual abuse, or the victim's psychological evaluation was consistent with sexual abuse. Establishing the credibility of the indicted acts of sexual abuse is what the State's case is all about and is the purpose for such expert testimony in the first place; the fact that such testimony may also indirectly, though necessarily, involve the child's credibility does not render it inadmissible.
>
> What is forbidden is expert opinion testimony that "directly addresses the credibility of the victim," i.e., "I believe the victim; I think the victim is telling the truth," or expert opinion testimony that implicitly goes to the ultimate issue to be decided by the jury, when such issue is not beyond the "ken" of the average juror, i.e., "In my opinion, the victim was sexually abused." Although the distinction may seem fine to a layman, there is a world of legal difference between expert testimony that "in my opinion, the victim's psychological exam was consistent with sexual abuse," and expert testimony that "in my opinion, the victim was sexually abused." In the first situation, the expert leaves the ultimate issue/conclusion for the jury to decide; in the second, the weight of the expert is put behind a factual conclusion which invades the province of the jury by providing a direct answer to the ultimate issue: was the victim sexually abused?

Mars, 116 Hawai‘i at 140, 170 P.3d at 876 (brackets and "[sic]" in original) (quoting Odom v. State, 531 S.E.2d 207, 208-09 (Ga. Ct. App. 2000)).

B.

Dr. Bivens's testimony was relevant to assisting the jury to understand the reaction and behavior of children to sexual abuse in general terms. He did not express any personal opinion about whether Minor's report of sexual abuse was truthful. Although Dr. Bivens's testimony may have assisted the jury in evaluating Minor's credibility, it did not constitute an impermissible personal opinion that Minor's report of abuse was truthful. See id. at 140-41, 170 P.3d at 876-77.

IV.

Silver argues that the prosecutor engaged in misconduct during closing argument by arguing matters not supported by the evidence, specifically: 1) grooming techniques of sexual predators, and 2) presenting a PowerPoint slide which stated that Minor "[n]ever changed his account of events." We conclude that Silver is not entitled to any relief based on these claims.

A.

Silver argues that the prosecutor's closing argument and PowerPoint slides improperly argued that Silver had engaged in "grooming" Minor to submit to sexual abuse, even though the circuit court had excluded expert testimony regarding grooming because of lack of a factual basis to support such testimony. Although it excluded expert testimony on grooming, the circuit court permitted the State to argue facts and reasonable inferences from the evidence.

> [Prosecutor]: Your Honor, just one more thing. To be clear, though. Anything that makes common sense or something that's within the realm of the lay witness, I can argue regardless of whether an expert talks about it; correct?
>
> [Court]: You can argue the facts and reasonable inferences therefrom.

As Hawai'i courts have recognized,

> [d]uring closing arguments, a prosecutor is permitted to draw reasonable inferences from the evidence and wide latitude is allowed in discussing the evidence. It is also within the bounds of legitimate argument for prosecutors to state, discuss, and comment on the evidence as well as to draw all reasonable inferences from the evidence. In other

21

words, closing argument affords the prosecution (as well as the defense) the opportunity to persuade the jury that its theory of the case is valid, based upon the evidence adduced and all reasonable inferences that can be drawn therefrom.

Mars, 116 Hawai'i at 142, 170 P.3d at 878 (brackets omitted; block quote formated changed) (quoting State v. Rogan, 91 Hawai'i 405, 412-13, 984 P.2d 1231, 1238-39 (1999)).

During closing argument, the prosecutor argued that Silver's conduct was consistent with his gradually testing the limits with Minor to see how far Silver could go. The prosecutor argued that Silver was getting "green lights" and felt he could keep going because, for example, "nobody said anything" about Silver's touching Minor in the pool. The prosecutor also argued that Silver planned the abuse, selected Minor because Silver did not think Minor would tell, and waited for an opportunity when Minor was tired and would be vulnerable. The circuit court sustained several objections made by Silver to the prosecutor's arguments.

In denying Silver's motion for a new trial, the circuit court made a finding of fact, which stated:

> 12. No portion of the Deputy Prosecutor's closing argument or rebuttal argument constituted "misconduct." The Court sustained four objections to portions of [the] State's closing and rebuttal arguments due to the way the arguments were phrased, but those arguments did not amount to an attempt by the Deputy Prosecutor to persuade the court or jury by use of deceptive or reprehensible methods.

The circuit court also found:

> 20. The State did not refer to inadmissible evidence during closing or argument. The State did not elicit prohibited testimony from Dr. Bivens and did not argue theories of "grooming" when discussing Defendant's conduct in the terms of "getting all these green lights" which drew the first of the Defense objections in closing argument. The Deputy Prosecutor's argument "Since the defendant was getting all these green lights, he felt he could keep going. How far can I go? Well, you know, nobody said anything about touching in the pool. Guess I can go further. I thought, move next to [Minor], nobody said a thing. I can keep going. Nighttime, [Minor] wore the pajamas, just like I asked. Guess I can keep going." This argument included facts in evidence during trial, but improperly phrased these as Defendant's actual thoughts, which were inferences, but not reasonable inferences, to draw from the facts presented. The objection was sustained

due to the way this argument was phrased, not because it argued precluded "theories of grooming."

We agree with the circuit court's assessment. Although Dr. Bivens's expert testimony regarding grooming was excluded, this ruling did not prohibit the State from arguing the evidence and reasonable inferences from the evidence. Based on the evidence presented, it was permissible for the prosecutor to argue that Silver had targeted Minor, because Minor appeared vulnerable, and that Silver had engaged in a series of steps to see how far he could go with Minor.

In analyzing allegations of prosecutorial misconduct, we consider "(1) the nature of the conduct; (2) the promptness of a curative instruction; and (3) the strength or weakness of the evidence against the defendant." State v. Maluia, 107 Hawai'i 20, 24, 108 P.3d 974, 978 (2005) (block quote format and citation omitted). Here, the nature of the prosecutor's arguments complained of were not deceptive or reprehensible. The arguments were objectionable because of the way they were phrased, but they were based on evidence admitted at trial. The circuit court sustained Silver's objections to the challenged arguments and promptly instructed the jury to disregard them. The alleged misconduct relating to "grooming" did not affect Silver's substantial rights.

B.

We also reject Silver's contention that the prosecution's PowerPoint slide which stated that Minor "[n]ever changed his account of events" and referred to people Minor "[t]old" constituted misconduct that requires Silver's convictions to be vacated. Silver did not object to this slide when it was displayed. During Silver's closing argument, Silver attempted to rebut this slide by arguing that the jury did not hear evidence of Minor's inconsistent statements because the prosecution did not introduce Minor's statements. The prosecution objected to Silver's argument.

23

At a bench conference, the circuit court advised the parties that both the prosecution's slide and Silver's attempt to rebut the slide by suggesting that the prosecution was "hiding the ball" were improper. The circuit court, however, permitted Silver to rebut the prosecution's contention that Minor "never changed his account of events" by arguing that there was no evidence to support the prosecution's claim. We conclude that the circuit court's ruling was sufficient to dissipate any prejudice from the prosecution's slide and thus the prosecution's use of the slide did not affect Silver's substantial rights.

V.

Silver argues that the circuit court abused its discretion by failing to conduct a timely hearing on the sleeping juror allegation. We disagree.

A.

After the circuit court completed its reading of the jury instructions to the jury, the circuit court asked, "I'm about to excuse the alternates [sic] jurors. Anything before I do so?" Silver's counsel responded, "I'll note that the juror up in the top row . . . I think is our last juror has been sleeping almost the entire trial. I would . . . ask that he be excused and that we move the alternate into his place." The juror was identified as Juror Number 12.

The prosecutor responded, " [Juror Number 12 has] been paying attention when I've been speaking to the jury. I saw him paying attention when I was speaking to the jury." The circuit court noted, "I make it a practice to observe the jurors. The juror in seat number 12, I have not seen sleeping through the trial." The circuit court denied Silver's request to replace Juror Number 12 with an alternate. The jury began deliberating on January 17, 2007, and returned its guilty verdicts on January 18, 2007.

On November 6, 2007, the circuit court conducted a hearing on Silver's Motion for New Trial. Silver called three witnesses. David Sereno, one of Silver's trial counsel,

24

testified that he saw Juror Number 12 sleeping.  Elizabeth Silver, Silver's sister-in-law, testified that she saw two jurors sleeping during the trial.  Silver testified that he saw Juror Number 12 sleeping "during various state witnesses' testimony[.]"  The circuit court orally granted Silver's request to summon the jurors for questioning.

On January 17, 2008, the circuit court questioned the twelve jurors and three alternate jurors.  All twelve jurors and three alternate jurors testified that they did not doze off or fall asleep during the trial and that they did not notice anyone else on the jury appear to doze off or fall asleep during the trial.  The circuit court made findings of fact that stated, "[t]here was no credible evidence that any juror or alternate juror was sleeping or dozing off during portions of the trial[,]" and that "Juror Number 12 did not fall asleep during the trial."

B.

When alleging juror misconduct,

> [t]he defendant must first make a prima facie showing of a deprivation that could substantially prejudice his or her right to a fair trial by an impartial jury.  We also suggested that the defendant should first present some specific, substantial evidence showing a juror was possibly biased.  Once the defendant has satisfied this burden, the trial court then determines whether the nature of the alleged deprivation rises to the level of being substantially prejudicial.  If the trial court determines that the alleged deprivation is substantially prejudicial, the trial court then becomes duty bound to further investigate the totality of circumstances surrounding the alleged deprivation to determine its impact on jury impartiality.

State v. Yamada, 108 Hawai'i 474, 479, 122 P.3d 254, 259 (2005) (citation, internal quotation marks, and emphases in original omitted).  Silver does not cite to any case law which imposes a specific time limit upon the trial court to hold a hearing on allegations of juror misconduct.  Silver waited until the end of trial to raise the allegation that a juror had been sleeping "almost the entire trial."  Silver also stipulated to a continuance of the hearing on his Motion for New Trial and then asked for additional delay after new counsel was retained to

25

represent him. The circuit court held hearings to investigate Silver's sleeping juror allegation and found that there was no credible evidence that any juror or alternate juror, including Juror Number 12, had been sleeping during the trial. We will not disturb the circuit court's finding on appeal. We conclude that the circuit court did not abuse its discretion in resolving Silver's sleeping juror allegation.

VI.

Silver argues that the State failed to introduce sufficient evidence to support his convictions for third degree sexual assault and, in the alternative, that HRS § 707-700 is void for vagueness. Among other things, Silver notes that HRS § 707-700 defines "sexual contact" as "any touching . . . of the sexual or other intimate parts of a person," and argues that buttocks are not "intimate parts" under this definition.

Silver was charged with third degree sexual assault in violation of HRS § 707-732(1)(b), which prohibits a person from "knowingly subject[ing] to sexual contact another person who is less than fourteen years old." The term "sexual contact," in turn, is defined by HRS § 707-700 to mean

> any touching, other than acts of "sexual penetration", of the sexual or other intimate parts of a person not married to the actor, or of the sexual or other intimate parts of the actor by the person, whether directly or through the clothing or other material intended to cover the sexual or other intimate parts.

(Emphases added.)

A.

The Hawai'i Supreme Court construed the definition of "sexual contact" in State v. Kalani, 108 Hawai'i 279, 118 P.3d 1222 (2005). The defendant Kalani was charged by indictment with two counts of sexual assault for twice kissing a nine-year-old complaining witness (CW) on the lips and placing his tongue in her mouth. Id. at 281, 118 P.3d at 1224. Kalani moved to dismiss the indictment on the ground of lack of sufficient evidence to support the charges. Id. Kalani argued that his alleged conduct did not constitute "sexual contact" as defined in

NOT FOR PUBLICATION  IN WEST'S HAWAI'I REPORTS AND PACIFIC REPORTER

HRS § 707-700 (1993).[11/]  Id.  The circuit court denied Kalani's motion to dismiss.  Id.

The circuit court acknowledged that the statute did not indicate what body parts are to be considered as "sexual or other intimate parts" within the statutory definition of "sexual contact."  Id.  The circuit court concluded that "intimacy, with respect to parts of the body, must be viewed within the context in which the contact takes place.  In other words, a body part that might be intimate in one context might not be intimate in another."  Id.  The circuit court stated although the mouth and tongue may not constitute "intimate parts" in all circumstances or contexts, they did constitute "intimate parts" in the context of Kalani's alleged conduct.  Id. at 281-82, 118 P.3d at 1224-25.

On appeal, the Hawai'i Supreme Court concluded that as used in the HRS § 707-700 definition of "sexual contact," the term "'sexual parts' clearly refers to the sex organs" and the term "'intimate parts' . . . refers to only those parts of the body typically associated with sexual relations."  Id. at 284-85, 118 P.3d at 1227-28.  Based on this construction, the Hawai'i Supreme Court held that Kalani's conduct constituted "sexual contact," and it therefore upheld the circuit court's denial of Kalani's motion to dismiss and affirmed Kalani's convictions.  Id. at 287, 118 P.3d at 1230.  The supreme court also rejected Kalani's claim that the statutory definition of "sexual contact" was void for vagueness, holding that "Kalani fails to establish that a person of ordinary intelligence would not know that

_____

[11/] The definition of "sexual contact" construed by the Supreme Court in Kalani provided as follows:

"Sexual contact" means any touching of the sexual or other intimate parts of a person not married to the actor, or of the sexual or other intimate parts of the actor by the person, whether directly or through the clothing or other material intended to cover the sexual or other intimate parts.

See Kalani, 108 Hawai'i at 281 n.2, 118 P.3d at 1224 n.2.

Kalani's conduct in the instant case constituted sexual contact." Id. at 288, 118 P.3d at 1231.

B.

We conclude, like the circuit court in Kalani, that whether a particular body part qualifies as an "intimate part" within the statutory definition of "sexual contact" depends on the context and circumstances of the case. "[A] body part which might be intimate in one context, might not be intimate in another [context]." People v. Rivera, 525 N.Y.S. 2d 118, 119 (N.Y. Sup. Ct. 1988).

For example, with respect to the buttocks, it is not uncommon for youth team coaches to give their players a congratulatory pat on the buttocks in recognition of a good play or outstanding effort. Parents hugging or carrying a young child may also place their hands on the child's buttocks. In these situations, adults are knowingly touching the buttocks of another person who is less than fourteen years old. But because of the context, it would be unreasonable to regard the child's buttocks as an "intimate part" for purposes of applying the sexual assault statutes.[12] In these contexts, the child's buttocks would not be a body part "typically associated with sexual relations." See Kalani, 108 Hawai'i at 284-85, 118 P.3d at 1227-28.

C.

When viewed in context, we conclude that there was sufficient evidence to show that Silver's touching of Minor's buttocks during the late night massages constituted the touching of an "intimate part" of Minor's body. These touchings took

_____

[12] As noted in Kalani, when first enacted, HRS § 707-700 (Special Pamphlet 1975) provided that "'[s]exual contact' means any touching of the sexual or other intimate parts of a person not married to the actor, done with the intent of gratifying the sexual desire of either party[.]" Kalani, 108 Hawai'i at 285, 118 P.3d at 1128 (citation and quotation marks omitted; brackets in original). In 1984, a penal code review committee recommended "that HRS § 707-700 be amended to limit the definition of 'sexual contact' to offensive contact with specifically enumerated parts of the body." Id. The Legislature did not accept the committee's recommendation and instead, in 1986, "expanded the definition of 'sexual contact' by removing the requirement that the proscribed conduct be done 'with the intent of gratifying the sexual desire of either party.'" Id.; see 1986 Haw. Sess. Laws Act 314 § 48 at 615.

28

place in the context of Silver, a 46-year-old adult, sleeping next to Minor, an eleven-year-old boy, waking Minor up late at night, telling Minor to be quiet, and then giving Minor unsolicited massages that included slowly "brushing" over Minor's buttocks and penis.[13]/

With respect to the pool incident, if this were the only charged sexual assault and we limited our consideration to the evidence of Silver's conduct in the pool, we would conclude that there was insufficient evidence to support his conviction on that count. The touching of a child's buttocks during horseplay in a pool normally would not constitute the touching of an "intimate" body part. However, viewing the evidence of Silver's conduct in the pool in the context of his subsequent conduct during the late night massages, and considering all the evidence presented in the light most favorable to the State, we conclude that there was sufficient evidence that Silver's touching of Minor's buttocks in the pool constituted the touching of an "intimate" body part. Considering the evidence in the strongest light for the State, we conclude that a rational jury could infer a direct connection between Silver's conduct in the pool and his late night massages and that Silver's actions were all part of a deliberate plan and concerted effort by him to subject Minor to sexual contact.

We reject Silver's contention that Minor's testimony was insufficient to support Silver's convictions. Minor's credibility was for the jury to decide. Based on our review of the record, we conclude that there was substantial evidence to support the jury's finding that Silver had sexually assaulted Minor as charged in Counts 1, 3, 4, and 5. We also reject Silver's argument that the statutory definition of "sexual

---

[13]/ Silver does not dispute that Minor's penis constituted a sexual or intimate part under the statutory definition of "sexual contact." We reject Silver's claim that the jury could not find that Silver touched Minor's buttocks and penis during the late night massages based on Minor's testimony that Silver slowly brushed over Minor's buttocks and penis.

contact" is void for vagueness. As applied to Silver's conduct in this case, the statutory definition of "sexual contact" was not unconstitutionally vague. See Kalani, 108 Hawai'i at 288, 118 P.3d at 1231; State v. Richie, 88 Hawai'i 19, 31-32, 960 P.2d 1227, 1239-40 (1998).

CONCLUSION

We affirm the March 7, 2008, Judgment of the circuit court.

DATED: Honolulu, Hawai'i, June 30, 2010.

On the briefs:

Peter Van Name Esser
Myles S. Breiner
Attorneys for Defendant-Appellant

Richard K. Minatoya
Deputy Prosecuting Attorney
County of Maui
Attorney for Plaintiff-Appellee

Chief Judge

Associate Judge

Associate Judge

30